IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
March 27, 2018 Session

**STATE OF TENNESSEE v. SHAWN NELSON SMOOT**

**Appeal from the Criminal Court for Roane County**
**No. 2012-CR-119   Jeffery Hill Wicks, Judge**

———————————————————

**No. E2017-00367-CCA-R3-CD**

———————————————————

A Roane County grand jury indicted the defendant, Shawn Nelson Smoot, with the first degree murder of the victim, Brooke Morris, and later convicted him of the same, for which he received an enhanced sentence of life imprisonment without the possibility of parole. The defendant raises the following issues on appeal: (1) the trial court erred when allowing the introduction of evidence seized during the warrantless search of his home under the theory of inevitable discovery; (2) the trial court erred when allowing expert ballistics and firearms identification testimony; (3) the trial court erred when allowing the introduction of evidence related to the victim's order of protection against the defendant; (4) the trial court erred when denying the defendant's motion to rehear all pretrial motions; (5) the trial court erred when allowing the victim's landlord to render hearsay testimony regarding an incident between the victim and the defendant; (6) the trial court erred when allowing several witnesses to offer improper character evidence under Tennessee Rule of Evidence 404(b); (7) the trial court erred when denying the defendant's request for a trial continuance so he could obtain a mitigation expert; (8) the trial court erred when allowing the State to amend the indictment to include an additional witness twelve days before trial; (9) the trial court erred when denying two motions for mistrial; (10) the trial court erred when admitting the autopsy report as evidence; (11) the trial court erred when admitting the prior consistent statement of the defendant's roommate into evidence; (12) the trial court erred when excluding the victim's text messages to her friends from evidence; (13) the trial court erred when instructing the jury on flight; (14) the State committed prosecutorial misconduct when making improper comments to the jury regarding evidence; (15) the State committed prosecutorial misconduct when commenting during closing arguments on the defendant's failure to testify; (16) the evidence was insufficient to support the jury's guilty verdict; (17) the State made an improper "golden rule" argument during the sentencing phase of trial; (18) the evidence was insufficient to support the jury's imposition of a life sentence without the possibility of parole; and (19) the cumulative effect of these errors warrant a reversal of the verdict. Based on the arguments of the parties, our review of the record, and the

pertinent law, we conclude the trial court erred when admitting the evidence seized during the search of the defendant's residence, when admitting certain hearsay statements contained in the order of protection documents, and when admitting the prior consistent statement of the defendant's roommate. These errors were harmless, and their cumulative effect did not change the outcome of either phase of trial. Discerning no further errors, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT L. HOLLOWAY, Jr., JJ., joined.

Robert L. Jolley, Jr., Knoxville, Tennessee, for the appellant, Shawn Nelson Smoot.

Herbert H. Slatery III, Attorney General and Reporter; Jeff Zentner, Assistant Attorney General; Russell Johnson, District Attorney General; and Tiffany Smith, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## *Facts and Procedural History*

This appeal arises as the result of the victim's death on October 15, 2011. The evening of October 14, 2011, the victim left her car in the parking lot of Altruda's Restaurant in Knoxville, Tennessee and spent the night with a friend. The next morning, the victim called the defendant, with whom she previously had a romantic relationship, and asked for a ride to her car. The defendant declined, indicating he would not be in the area, but the two remained in constant contact throughout the day via six telephone calls and forty-three text messages.

Eventually, the defendant and the victim went to Buffalo Wild Wings and Wild Wings Café together. While at Wild Wings Café, the two sat at the bar and were served by bartender Alexandria Dukic, who was familiar with the defendant because he frequented the bar. The defendant's receipt, authenticated at trial by Eric McCann, the general manager of Wild Wings Café, confirmed the defendant ordered a bucket of beer and a Smirnoff Strawberry shot. The defendant was not as talkative as usual. Ms. Dukic did not observe any other odd behavior but felt tension between the defendant and the victim. At some point, the victim went to the restroom, leaving the defendant alone at the bar. In her absence, the defendant ordered and drank the Smirnoff Strawberry shot. The defendant then paid the bill and left with the victim around 6:30 p.m. Security footage

showed the defendant open the door for the victim, and the victim walking noticeably ahead of the defendant.

The defendant's cell phone records indicated that while at Wild Wings Café, he sent the victim a text message at 5:45 p.m. stating, "Don't f*** this up." The defendant sent another text message at 6:31 p.m. stating, "Please don't f*** this up!" Cell phone records did not show any further communications between the two after this time.

The victim and Daniel Hawkins also sent text messages to one another throughout the day. Mr. Hawkins previously lived in Knoxville but moved to Colorado for work and maintained what he described as a "friends with benefits" relationship with the victim. Mr. Hawkins was in town for a football game and attempted to make plans with the victim, who was not going to the game but planned to meet Mr. Hawkins afterwards. Mr. Hawkins sent the victim a text message at 5:53 p.m. advising her of his location, and she never responded. Mr. Hawkins sent a follow-up text message at 10:20 p.m. stating, "Uh, Where are you darling?" Again, the victim never responded. Mr. Hawkins returned to Colorado the next day without seeing the victim.

Around 8:00 p.m., Debra and Larry McCabe were driving down Blair Road. Mrs. McCabe noticed what appeared to be a body lying close to the intersection of Blair Road and Old Blair Road. They turned around to see if the individual needed help and discovered the victim's body. There was a lot of blood at the scene, and the victim appeared injured. Mr. McCabe checked the victim's pulse and did not find one. Mrs. McCabe called 911, and first responders arrived at the scene shortly thereafter.

Officer Stanley Hohulin with the Roane County Sheriff's Department was the first emergency responder to reach the scene. Officer Hohulin received a call regarding the discovery of the victim's body around 8:06 p.m. and arrived approximately two minutes later. When emergency medical services ("EMS") arrived, paramedics confirmed the victim's death. Paramedics discovered the victim's cell phone under her body, and Officer Hohulin directed them to turn off the phone and place it on her chest.

Detective Art Wolfe, then a detective with the Roane County Sheriff's Department, received a call a little after 8:00 p.m. on October 15, 2011, requesting he investigate a fatality on Old Blair Road. The area was secluded and rural. There were no street lights, and the houses were not visible from the street. Detective Wolfe used a flashlight to assess his surroundings. As he approached the victim's body, which paramedics had already covered with a yellow security blanket, he noted droplets of blood on the street that became larger pools of blood the closer he got to the victim. The victim's cell phone and purse were discovered at the scene. The victim's purse, which had blood stains on its interior and exterior, contained a wallet, money, credit cards, and

- 3 -

jewelry. The detectives identified the victim using the driver's license found inside her wallet. The victim's clothes and boots were bloody, and blood stains were visible on both the tops and soles of her boots. Detective Wolfe found two unfired and three fired shell casings near the victim's body. Detective Wolfe collected, sealed, and placed all evidence in the evidence lockers at the Roane County Sheriff's Office and photographed the crime scene. Subsequent tests did not reveal the defendant's DNA or fingerprints on any of the evidence found at the crime scene.

Detective Wolfe contacted Jeff Vittatoe, a criminal investigator for the Ninth Judicial District Attorney General's Office, and Brad Nealon, a special agent with the Tennessee Bureau of Investigation ("TBI"), and asked them to come to the crime scene off of Blair Road to assist with the investigation. Upon arrival, officers handed Investigator Vittatoe the victim's cell phone so he could find contact information for the victim's next-of-kin and determine who she had been in contact with prior to her death. Investigator Vittatoe gave Agent Nealon the victim's phone, and Agent Nealon later took it to the TBI Technical Services Unit in Nashville for analysis.

After running a background report on the victim, officers determined she had an active order of protection against the defendant. Authorities then identified the defendant as a person of interest and issued a "be-on-the-lookout" or "BOLO" for him. Detective Wolfe remained at the crime scene until approximately 6:00 a.m., at which time he returned to the Roane County Sheriff's Office and began searching databases for information regarding the defendant. Around 3:00 p.m. on October 16, 2011, Detective Wolfe returned to the crime scene and found another shell casing.

Early in the morning of October 16, 2011, Investigator Vittatoe and his partner, Investigator Brendan DeBoer, travelled to the defendant's suspected residence. They watched the townhouse for approximately one hour and did not observe any activity. They noted a vehicle registered to the defendant parked outside the townhouse and received the defendant's voicemail when calling the telephone number associated with the address. Around 6:00 a.m., Investigators Vittatoe and DeBoer knocked on the townhouse door. The defendant answered, wearing only boxer shorts. Investigator Vittatoe asked the defendant if he would be willing to answer a few questions, and the defendant agreed but first excused himself to get dressed. The defendant returned wearing jeans, a sweatshirt, and tennis shoes.

Investigator Vittatoe asked the defendant if he knew the victim. The defendant said the victim used to be an employee of the Allstate Insurance Company he owned. The two previously dated and continued to be friends after the relationship ended. The defendant asked the investigators what was going on, and they said they were conducting

- 4 -

a welfare check on the victim. Investigator Vittatoe asked the defendant when he last saw the victim, and the defendant said around 6:30 or 7:00 p.m. the prior evening.

Investigator Vittatoe asked the defendant to recount all interactions he had with the victim on October 15, 2011. The defendant indicated the victim called him at 9:30 a.m., said she was at a friend's house in Knoxville, and asked for a ride to her vehicle because she left it in a restaurant parking lot the proceeding evening. The defendant picked the victim up from the friend's house around 1:00 p.m. and took her back to her house, where she showered and dressed. They then went to Buffalo Wild Wings to watch a football game, eat dinner, and have drinks. They left around 5:30 p.m. and went to Wild Wings Café for a few beers. The victim had plans to meet a friend in town from Colorado, so the defendant took her back to her car at Altruda's Restaurant around 6:30 or 7:00 p.m. but did not see her get in the car. After dropping off the victim, the defendant went home, took a nap, and did not leave for the remainder of the evening.

Investigator Vittatoe asked if the defendant owned any weapons, and the defendant said he owned a shotgun. Investigator Vittatoe then asked whether the defendant owned any handguns. Only then did the defendant admit to owning a Kel-Tec P-32 handgun.

During questioning, Chief Tim Phillips from the Roane County Sheriff's Department and Agent Nealon arrived and waited in the parking lot. Investigator Vittatoe asked the defendant if he would hang out with Investigator DeBoer while he spoke with the officers outside, and the defendant agreed. Investigator Vittatoe told the officers the defendant admitted to being with the victim until 6:30 or 7:00 p.m. the prior night and to owning a Kel-Tec P-32 handgun, so he wanted to confront the defendant about the victim's death. Agent Nealon agreed he could do so.

Investigator Vittatoe returned and told the defendant the victim's body had been discovered in Roane County, and she had been murdered. The defendant just shook his head and said, "Okay." Investigator Vittatoe asked, "[I]f I were to tell you that your phone was discovered near the crime scene . . . what would you say to that?" The defendant did not respond. Investigator Vittatoe said, "I don't think you're being completely honest with me. We'd like to – we'd like to [get] to the truth here. And it wouldn't look good on you if the evidence proved that you were being dishonest." The defendant then offered a slightly different version of events. The defendant said that after dropping the victim off at her car, he went home but subsequently decided drive to South Carolina. He changed his mind en route, turned around, stopped at a liquor store, and went home. Investigator Vittatoe told the defendant he believed the defendant was responsible for the victim's death.

Investigator Vittatoe then informed the defendant he would be detained while officers searched his residence. Investigator Vittatoe patted down the defendant, who did not have any weapons, and placed him in the back of a patrol car without handcuffs. Investigator Vittatoe did this for the safety of the officers, to preserve evidence from destruction, and due to the pending order of protection. Investigator Vittatoe had not yet seen the order of protection and thought the defendant potentially admitted to being in violation of it. Around 10:30 a.m., officers confirmed the order of protection was still active but allowed social contact between the defendant and the victim, so the officers let the defendant out of the patrol car.

The search of the defendant's townhouse occurred around 5:50 p.m. on October 16, 2011. Investigators Vittatoe and Nealon searched the ground floor. Inside a front room, they found a cardboard box containing a Kel-Tec P-32 gun case, a Kel-Tec P-32 owner's manual, and Kel-Tec P-32 gun safety locks. The handgun was not inside the case. In a closet between the living room and dining room, Investigator Vittatoe found a cardboard box containing both handgun and shotgun ammunition. Significantly, Investigator Vittatoe found a box containing Browning 7.65 caliber ammunition, the same caliber of ammunition found at the murder scene. An orange tag on the box said, "Don's Weaponry," and included the store's phone number. The investigators also found a third box on the floor of the closet containing one live round.

During the course of the search, Brett Meloccaro, the defendant's roommate, requested entrance to the residence to gather the things needed for an upcoming out-of-town trip. An officer escorted Mr. Meloccaro inside the townhouse. None of the officers asked Mr. Meloccaro for his permission to search the residence.

On October 17, 2011, Mr. Hawkins learned of the victim's death. Upon hearing of her death, he contacted Detective Wolfe to advise he had been in communication with her on October 15, 2011, but had not seen her. He wanted to make it clear he had nothing to do with her death.

The same day, Amy Reed Denlinger, who worked with the defendant at Allstate, ran into the defendant at their office. The defendant was putting part of his computer into his Jeep while trembling and shaking profusely. Ms. Denlinger asked the defendant if she could help, and the defendant said, "Turn back time." Ms. Denlinger said she heard about the victim's death and that the defendant and Mr. Meloccaro were suspects. The defendant told her Mr. Meloccaro was not involved, so Ms. Denlinger asked the defendant whether he had any direct or indirect involvement in the murder. The defendant responded, "Both."

From the crime scene, EMS transported the victim's body to Knoxville Forensic Center for autopsy. On October 17, 2011, Dr. Steven Cogswell, then the deputy chief medical examiner in Knox County, performed the autopsy in the presence of Detective Wolfe. Dr. Cogswell found the victim suffered three gunshot wounds fired from an undetermined range – one to the chest, one to the neck, and one to the back of the head. The victim suffered a penetrating gunshot wound to the chest. Detective Wolfe received this bullet during the autopsy and preserved it as evidence. Dr. Cogswell determined the bullet entered through the victim's left shoulder, moved into to her chest cavity, pierced her left lung, and travelled to the middle of her chest, hitting her pulmonary artery. The victim suffered a perforating gunshot wound to her neck. The bullet entered just below the left side of the victim's jaw, travelled through her neck, hit the left jugular vein, and exited the right side of the neck. The bullet did not leave any fragments inside the victim's body. Finally, the victim suffered a penetrating gunshot wound to her head. Detective Wolfe also received this bullet during the autopsy and preserved it as evidence. This bullet entered the back of the victim's head, almost midline. Half the bullet went into the victim's brain, and the other half imbedded into her skull. Bullet fragments hit the victim's cerebellum and brain stem.

Dr. Cogswell could not determine the exact order in which the victim received the gunshot wounds but opined the gunshot wound to the head occurred last, as brain stem damage causes instantaneous death. Dr. Cogswell further opined the victim was alive when shot in the neck and chest because both wounds caused severe bleeding, and his examination showed the victim inhaled and swallowed some of the blood lost from her neck. Moreover, the victim was alive long enough after the gunshot wound to her chest for it to cause the accumulation of approximately a quart of blood in her chest cavity. Blood stains on the bottom of the victim's boots indicated she was on her feet or slumped over in a seated position at some point during the shooting. Without medical assistance, any of the gunshot wounds would eventually have been fatal.

Dr. Cogswell tested samples taken from the victim for gunshot residue. The tests were negative. Dr. Cogswell opined this indicated the shots were fired from over three to five feet away or something blocked the powder from getting to the body.

The ensuing investigation took months. During that time, officers obtained the defendant's cell phone records from Verizon, and Karen Milbrandt certified their authenticity at trial. Through those records, Agent Nealon pieced together the defendant's interactions with the victim on October 15, 2011. There were six telephone calls between the two that began at 9:17 a.m. and ended at 1:02 p.m. There were also forty-three text messages between the two that primarily addressed the victim's request that the defendant take her to her car and their ensuing plans for the day. These text

messages began at 9:18 a.m. and ended with the defendant's final text at 6:31 p.m., stating, "Please don't f*** this up!"

Agent Nealon additionally analyzed records that documented communications between the defendant and the victim going back to August 22, 2011. The victim called the defendant on August 22, 2011, and the defendant then called her twice the same day. There were no additional calls until September 17, 2011, when the defendant called the victim using "star 67" to block his number from appearing on her phone. This continued on September 22 and September 24, 2011. On September 28, 2011, the victim called the defendant at 3:00 a.m., and the defendant called her later that afternoon. Between September 30 and October 4, 2011, the defendant and the victim had multiple calls back and forth, and the defendant did not use "star 67" to block his phone number. However, on October 8, 2011, the defendant again initiated a call to the victim using "star 67." On October 11, 2011, beginning at 1:23 a.m., there were ten calls between the defendant and the victim, with the victim placing the initiating call. There were twenty-six calls between the defendant and the victim on October 12, 2011, and three on October 13, 2011. The defendant initiated the calls on both dates. On October 14, 2011, the defendant called the victim at 7:00 a.m., again using "star 67" to block his identity from her phone. He followed up with four additional calls between 7:01 a.m. and 7:36 a.m. and preceded each with "star 67." There were a total of twelve calls between the defendant and the victim on October 14, 2011, and the defendant initiated all but one of them.

Michael Frizzell, a special agent with the TBI and task force officer for the Federal Bureau of Investigation ("FBI"), analyzed the defendant's cell phone records for information regarding the cell phone tower used to communicate each call and text message occurring between 4:00 p.m. and 11:59 p.m. on October 15, 2011. When in use from approximately 4:00 p.m. through 6:31 p.m., the defendant's cell phone communicated with towers in proximity to Buffalo Wild Wings and Wild Wings Café. Then, approximately two hours lapsed without any cell phone usage by the defendant. It was not possible for Agent Frizzell to determine the cell phone's location during that time period. From approximately 8:51 p.m. through 9:59 p.m., the defendant's cell phone resumed communications with towers in proximity to the defendant's residence and Altruda's Restaurant. From approximately 10:00 p.m. to 10:50 p.m., the defendant's cell phone communicated eighty-four times with a tower in proximity to his home. From 10:53 p.m. to 10:57 p.m., the defendant's cell phone communicated three times with the same tower close to his home. From approximately 11:04 p.m. through 11:29 p.m., the defendant's cell phone communicated with multiple towers throughout Knoxville, Tennessee in a manner indicating the cell phone was in motion and travelling east. The phone communicated with a tower in Kodak, Tennessee at approximately 11:33 p.m. and then appeared to turn around and begin travelling west back to the defendant's residence.

The final cell site activity occurred at approximately 11:56 p.m. with the tower near the defendant's residence.

Doug Williams, also a special agent for the TBI, conducted a forensic examination of the victim's cell phone. He did not obtain any records from her cell phone provider, Cricket. Twice Agent Williams attempted to use computer software to pull information off the phone but could not obtain anything. He instead placed the phone in a cradle and took photographs of the information in the phone. The defendant's phone records revealed communications with the victim that were not found during the forensic analysis of the victim's cell phone, leading Agent Williams to believe the victim had deleted some of her phone calls and text messages. The last text message in the victim's phone was to someone named "Tommy Gardner."

Officers also interviewed over fifty witnesses and obtained security surveillance video from the home of Edwin Kelley, Jr., located near the crime scene. The surveillance footage revealed only one unidentified vehicle between 7:00 p.m. and 8:00 p.m. on October 15, 2011. The vehicle turned, pulled into Mr. Kelley's driveway at 7:58:52 p.m., and pulled out at 7:59:08 p.m. The vehicle then drove towards the corner of Blair Road and Old Blair Road.

In addition, Detective Wolfe obtained the petition for order of protection filed by the victim against the defendant on January 18, 2011. The petition indicated the defendant and the victim had dated, and the defendant owned a pistol that he kept in his truck. The petition further alleged the defendant had abused or threatened to abuse the victim in Knox County, and the victim was in "immediate and present danger of abuse." The victim requested a "no contact order of protection" and that the defendant, "pay for the repair of the bathroom window."

The Fourth Circuit Court entered an ex parte order of protection against the defendant on January 20, 2011, and set a hearing for February 10, 2011. Prior to the hearing, the victim and the defendant entered into an agreed order of protection that was to be effective until February 9, 2012, so it was still active when the victim died. This order specified: [1]

> [T]he court makes no finding of fact; <u>no hearing has been held</u>; no testimony has been offered; and the respondent has made no admission with reference to this proceeding by virtue of his/her consent to the agreement, through counsel, or otherwise. **This order has no effect upon**

---

[1] The original document contained the emphasis.

**[the defendant's] Second Amendment right to keep and bear arms. That right is <u>unimpaired</u> by this order.**

Lisa Callis, a representative from the Fourth Circuit Court, certified the accuracy of the copies of the petition for order of protection, ex parte order of protection, and agreed order of protection exhibited at trial.

On June 18, 2012, a Roane County grand jury returned an indictment against the defendant charging him with one count of first degree murder. The defendant failed to appear for his arraignment, so the trial court issued a capias, and Detective Wolfe contacted the U.S. Marshall Service regarding the defendant's arrest. The defendant had moved to Pearl River County, Mississippi at the time, where he had lived as a child. After being contacted by the U.S. Marshall Service, Sheriff David Allison with the Pearl River Sheriff's Department issued a BOLO for the defendant. He later arrested the defendant in the parking lot of a local business. At the time of his arrest, the defendant had a shotgun, clothing, and sleeping bag in his car.

Prior to trial, the defendant filed numerous pretrial motions, including a motion to suppress the evidence seized during the searches of his home and vehicle, motion to preclude the testimony of Agent Steve Scott regarding ballistics evidence, motion to exclude evidence related to the order of protection, motion to preclude evidence of flight, and several motions to continue the trial. The trial court granted the motion to suppress but ultimately allowed the admission of the evidence seized during the search of the defendant's home because the officers would have inevitably discovered it had they asked Mr. Meloccaro for permission to search the common areas of the residence. The trial court denied the motion to exclude the order of protection documents but ordered the parties to redact the victim's hearsay statements from the petition for order of protection. The trial court denied the motions to preclude Agent Scott's testimony regarding ballistics evidence and allegations of flight. The trial court granted at least three motions to continue the trial but ultimately denied the defendant's request to continue the setting for July 25, 2016.

The State also filed numerous motions and notices, including a notice of its intent to seek life imprisonment without the possibility of parole and notice of its intent to introduce evidence of prior bad acts pursuant to Tennessee Rule of Evidence 404(b). The trial court held an evidentiary hearing regarding the State's notice of its intent to introduce evidence of prior bad acts that spanned the course of several days. It heard testimony from eleven witnesses, including Carol Meredith, Dr. Michelle Hall, Kaitlyn Okal, and James Cordell. The trial court subsequently entered an order allowing these witnesses to testify at trial as to prior interactions with the defendant that were related in some manner to his relationship with the victim.

At trial, the State called Tina Gregg, Larry McCabe, Debra McCabe, Detective Art Wolfe, Officer Stanley Hohulin, Lisa Callis, Dr. Steven Cogswell, Investigator Jeff Vittatoe, Dr. Michelle Hall, Steve Scott, Karen Milbrodt, Brett Meloccaro, Don Hill, Agent Brad Nealon, Eric McCann, Agent Doug Williams, Agent Michael Frizzell, Alexandria Dukic, Daniel Hawkins, Kaityn Okal, James Cordell, Carol Meredith, Sheriff David Allison, and Amy Reed Delinger as witnesses. Mr. and Mrs. McCabe, Detective Wolfe, Ms. Callis, Mr. Meloccaro, Mr. Hawkins, Ms. Delinger, Dr. Cogswell, Investigator Vittatoe, Ms. Milbrodt, Agent Nealon, Mr. McCann, Agent Williams, Agent Frizzell, Ms. Dukic, and Sheriff Allison all testified consistently with the foregoing. Ms. Gregg, the victim's mother, identified a photograph of the victim at trial and indicated she last spoke with the victim on October 12, 2011. Dr. Hall, the defendant's ex-wife, testified regarding her interactions with the defendant about his relationship with the victim.

According to Dr. Hall, on January 4, 2011, the defendant said his Jeep needed to be repaired, so Dr. Hall followed him from his office back to their house. The defendant parked his Jeep at home, and Dr. Hall took the defendant back to his office. While on the way back to his office, the defendant told Dr. Hall the victim, who worked in his Allstate office at the time, was crazy and wanted to tell Dr. Hall she and the defendant were having an affair. Dr. Hall and the defendant then passed the victim in the parking lot of a gas station near their house. After seeing her, the defendant changed his mind about returning to the office and asked Dr. Hall to take him home instead.

The victim then called the defendant on his cell phone. Dr. Hall took the phone and had a thirty minute conversation with the victim. After the conversation ended, Dr. Hall asked the defendant how the victim knew intimate details like the color of the defendant's underwear and the presence of a scar on his penis. The defendant said he left the bathroom at work without fastening his pants entirely, so the victim saw his underwear. The victim knew about the scar because they were close friends, and he told her about it. Dr. Hall asked why the victim knew about past conversations between the defendant and Dr. Hall. The defendant again said he and the victim were really good friends, so he told her everything. Dr. Hall asked why the victim could describe pictures in their home. The defendant said once while Dr. Hall was out of town, the victim came inside the house before the two went out after work. Eventually, the defendant admitted to having an inappropriate relationship with the victim but said it was limited to kissing, spending time together, going out with her friends, and going to dinner together. The defendant never admitted to being intimately sexually involved with the victim.

Dr. Hall further testified that one night the defendant returned home drunk and passed out on the couch. Dr. Hall found the defendant's car parked in the garage with a

broken windshield. The defendant's cell phone was open, and Dr. Hall read inappropriate text messages from unknown numbers. Dr. Hall confronted the defendant, who blamed the broken windshield on a rock and became argumentative about the text messages.

The defendant and Dr. Hall got married in 2006. They separated on January 5, 2011, the day after the defendant disclosed his inappropriate relationship with the victim. The defendant and Dr. Hall remained separated until their divorce became final in June of 2011.

Carol Meredith owned an apartment building and rented a ground level apartment to the victim. Mrs. Meredith lived in the house next door. On January 16, 2011, Mrs. Meredith received a call from the tenant that lived above the victim. The tenant told Mrs. Meredith she heard terrible screams from the apartment below and requested Mrs. Meredith's presence. Mrs. Meredith arrived at the apartment and met the victim at the door. The victim had been crying, was shaking, and had messy hair. The victim told Mrs. Meredith she entered the apartment, and the defendant jumped out of her shower, fought with her, threw her on the tile floor, tried to hit her, beat her head against the floor, and tried to rape her. The defendant had entered the apartment through the victim's bathroom window, causing the window frame to break and a hairline crack in the window. The police were called, and Mrs. Meredith went home.

The next day, Mrs. Meredith's husband called the defendant and said he was responsible for the cost of repairing the window. The defendant agreed, and Mr. Meredith requested $275.00. The defendant mailed Mr. Meredith a money order for $250.00 along with a letter of apology stating, in part, "Women make us do crazy things." In response, Mrs. Meredith demanded the remaining $25.00. The defendant responded by sending a second letter and enclosing $25.00 cash.

Two of the victim's friends also testified regarding their interactions with the defendant and the victim. Kaitlyn Okal, who had been best friends with the victim since the eighth grade, testified that she first met the defendant in 2010 at a Mexican restaurant close to the Allstate office. Ms. Okal and the victim met for dinner. The defendant was present as well and had been drinking "shot after shot." When it was time to leave the restaurant, the victim got into Ms. Okal's car so she could take the victim back to her car at Allstate. The defendant became furious that the victim did not ride with him and followed. Once at Allstate, the victim exited Ms. Okal's car and got into her own vehicle. While the victim's driver's side door was open, the defendant grabbed her by the arm. The victim then got back into Ms. Okal's car, and the two went to a friend's house for a couple of hours until they felt safe returning to the victim's car.

Ms. Okal later saw the defendant at a home builder's association meeting she attended with her husband. The defendant asked Ms. Okal not to say anything to his wife about his relationship with the victim. At the time, the defendant referred to the victim as his girlfriend. Another time, the defendant called Ms. Okal and asked if the victim had a boyfriend or any men she considered friends.

James Cordell testified he was friends with the victim and had met the defendant a couple of times. The defendant once showed up at a birthday party for one of the victim's friends. The victim was upset by the defendant's presence, so Mr. Cordell asked him to leave. The defendant told Mr. Cordell the victim had ruined his life by telling his wife about their relationship.

At trial, the defendant's roommate, Mr. Meloccaro, also identified a picture of a Kel-Tec P-32 as the type of pistol owned by the defendant. In addition to testifying regarding his brief interaction with the officers during their search of the townhouse he shared with the defendant, Mr. Meloccaro testified that October 14, 2011, the day before the victim's death, there was a "pocket pistol" on the table in their townhouse. He asked the defendant about it, and the defendant said he took it out of his vehicle to be cleaned. Mr. Meloccaro admitted to previously telling officers the defendant kept the gun in his car.

Don Hill, the president of Don's Weaponry and Shooting Gallery, Inc., in North Little Rock, Arkansas, also testified regarding the defendant's gun ownership. Mr. Hill produced receipts showing the defendant bought a Mossberg 500 shotgun September 1, 2005, and a Kel-Tec P-32 pistol and a box of ammunition on January 14, 2009. Mr. Hill identified the gun box found during the search of the defendant's home as the box that would have held the Kel-Tec P-32 handgun purchased from his store. He also identified the box of ammunition found during the search as the ammunition purchased at his store.

Finally, the State called Agent Steve Scott to testify as a firearms identification and ballistics expert. After hearing testimony regarding his related training and experience, the trial court accepted his designation as such. The State asked Agent Scott to determine the caliber of the bullets and cartridges found at the crime scene, the caliber of the bullets recovered during the autopsy, and the type of firearm from which they were fired. The State additionally requested Agent Scott to perform proximity testing on the victim's shirt.

Agent Scott determined, to a reasonable degree of scientific certainty, the bullets and cartridges were all the same brand – Fiocchi. They were also the same caliber – .32 automatic or 7.65 cartridge cases. Agent Scott opined the three cartridge cases found at the scene and the bullets recovered during the autopsy had been fired from the same gun.

When reaching these conclusions, Agent Scott examined the bullets and cartridge cases under a microscope using a magnification of 40X. He measured and quantified certain class characteristics on each fired bullet, such as caliber and number of riffling groves, and based on their similarities, determined they had been fired from the same firearm. Agent Scott then inputted the data into a general riffling characteristics database created by the FBI and received a list of firearm manufacturers making guns that fit the riffling profile. The list included firearm manufacturers Astra, Colt, Dickson, Kel-Tec, Liberty, Ruby, and Unique.

With respect to the live cartridges found at the scene, Agent Scott compared them to one another to determine whether there were similar chamber marks, magazine marks, feed ramp marks, or extractor ejector marks and determined they too had been fired from the same firearm. Agent Scott conducted a similar comparison of the unfired cartridge cases and concluded at least one fired and one unfired cartridge had been cycled through the same gun. Agent Scott compared the three unfired cartridges from the crime scene and unfired cartridges seized from the defendant's house and concluded they were the same caliber and brand.

Agent Scott examined the victim's shirt and noted one hole in the back of the left shoulder/upper arm area. He then microscopically examined the area and chemically processed it for the presence of gun powder and lead residues. Agent Scott found scant residues but the quantity found were insufficient to determine from what proximity the victim had been shot.

Following a *Momon* hearing, the defendant declined to testify. The defendant then entered two agreed stipulations regarding the testimony that would have been rendered by Edwin Kelley, Jr. and William Tobin had they been called as witnesses at trial. Mr. Kelley would have testified that he was a resident of 809 Old Blair Road, approximately 100 yards from the location the victim's body was found on October 15, 2011. He provided the Roane County Sheriff's Office with a copy of the surveillance video from his home security system for the evening of October 15, 2011, which depicted only one vehicle between 7:00 p.m. and 8:00 p.m. During that time period, an unidentified vehicle turned into Mr. Kelley's driveway at 7:58:52, left his driveway at approximately 7:59:08, and drove towards the corner of Blair Road and Old Blair Road. The defendant then played the surveillance video for the jury.

Per the second stipulation, Mr. Tobin would have testified as an expert in the fields of forensic metallurgy and structural engineering and countered the expert opinions rendered by Agent Scott. Mr. Tobin disagreed with Agent Scott's underlying assumption that each firearm makes a unique set of tool markings that allow firearms examiners to

identify the markings of one firearm to the exclusion of others. Mr. Tobin based his opinion on the lack of scientific standards, objective testing, and study in the area of firearm identification. Mr. Tobin's opinions were further set forth in his article *Hypothesis Testing of the Critical Underlying Premise of Discernible Uniqueness in Firearms-Toolmarks Forensic Practice*, which was exhibited and provided to the jury.

After being charged, hearing closing arguments, and deliberating, the jury found the defendant guilty of premeditated first degree murder. The trial court approved the verdict as the thirteenth juror. The trial court later held a sentencing hearing where the jury heard Ms. Gregg, the victim's mother, and Brittany Myers, the victim's sister, give victim impact statements. The defendant did not present any proof.

The State sought a sentence of life in prison without the possibility of parole under Tennessee Code Annotated section 39-13-204(i)(5) because "[t]he murder was especially heinous, atrocious, or cruel, in that it involved torture or serious physical abuse beyond that necessary to produce death." The defendant objected, asserting the victim died following three gunshots fired over the course of approximately four minutes. These circumstances were insufficient to support the aggravating factor cited by the State. In response, the State contended the evidence was sufficient to establish the defendant used greater force than necessary to kill the victim. Dr. Cogswell testified that all three shots were fatal, though the first two did not immediately kill the victim. The victim was alive and likely aware she was dying as the gunshots were fired. The State then cited several Tennessee cases finding torture or serious physical abuse when the victim was aware she would die but did not immediately do so. The trial court overruled the defendant's objection.

The State then made its closing argument, during which it painted a detailed image of the circumstances surrounding the victim's death for the jury. The defendant declined to make a closing argument. After being charged, the jury returned a verdict sentencing the defendant to life in prison without the possibility of parole. Relying on the final autopsy report, the jury found the murder was heinous and cruel because "gunshot[s] B and C cause[d] aspirations and swallowing of blood [and] lacerations at [the] base of [the] tongue not resulting in immediate death, causing pain and suffering." The jury further found the murder constituted torture, as evidenced by the two live rounds found at the scene, so "[s]he was aware of what was happening while hearing multiple shots and clicks."

The defendant filed numerous post-trial motions, including a motion for new trial, pro se motion for judgment of acquittal or for a new trial, renewed motion for judgment of acquittal as to sentencing findings, amended motion for a new trial, and second

amended motion for new trial. These motions included all of the arguments raised by the defendant on appeal. The trial court denied all motions, and this timely appeal followed.

*Analysis*

## I.    Suppression of Evidence

The defendant first argues officers searched his home and car pursuant to invalid search warrants, and the trial court erred when allowing the introduction of the evidence seized during those searches under a theory of inevitable discovery. The Fourth Amendment to the United States Constitution and Article I, section 7 of the Tennessee Constitution guarantee freedom from unreasonable searches and seizures. These guarantees exist to "safeguard the privacy and security of individuals against arbitrary invasions of government officials." *Camara v. Municipal Court*, 387 U.S. 523, 528 (1967); *see State v. Downey*, 945 S.W.2d 102, 106 (Tenn. 1997). A search and seizure conducted under a valid search warrant is presumptively reasonable, but a warrantless search is presumptively unreasonable and the evidence discovered is subject to suppression unless the State demonstrates the search or seizure was conducted pursuant to an exception to the warrant requirement. *State v. McCormick*, 494 S.W.3d 673, 678 (Tenn. 2016) (internal citations omitted). The State has the burden of demonstrating, by a preponderance of the evidence, that a warrantless search passed constitutional muster. *State v. Harris*, 280 S.W.3d 832, 839 (Tenn. Crim. App. 2008).

The Fourth Amendment to the United States Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. Amend. IV. Accordingly, to comply with the federal constitution, a warrant must (1) be issued by a neutral and detached magistrate, (2) particularly describe the place to be searched and the persons or things to be seized, and (3) be based upon probable cause, "supported by Oath or affirmation." *State v. Davidson*, 509 S.W.3d 156, 182 (Tenn. 2016).

Similarly, the counterpart in the Tennessee Constitution states:

That the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; and that general

warrants, whereby an officer may be commanded to search suspected places, without evidence of the fact committed, or to seize any person or persons not named, whose offenses are not particularly described and supported by evidence, are dangerous to liberty and ought not to be granted.

Tenn. Const. art. 1, § 7.

Tennessee law then imposes an additional affidavit requirement. *See* Tenn. Code Ann. § 40-6-103 (providing a "search warrant can only be issued on probable cause, supported by affidavit, naming or describing the person, and particularly describing the property, and the place to be searched"); *see also* Tenn. R. Crim. P. 41(c) (stating that a "warrant shall issue only on an affidavit or affidavits that are sworn before the magistrate and establish the grounds for issuing the warrant" and requiring any subsequently issued warrant to "describe the property or person to be seized"). The commonly recognized exceptions to these warrant requirements are: (1) search incident to an arrest, (2) the plain view doctrine, (3) consent to the search, (4) *Terry* stop and frisk, and (5) the existence of exigent circumstances. *State v. Cox*, 171 S.W.3d 174, 179 (Tenn. 2005).

Aside from the exceptions to the warrant requirement, illegally obtained evidence is admissible under the inevitable discovery doctrine if it would have otherwise been discovered by lawful means. *Nix v. Williams*, 467 U.S. 431, 444 (1984); *State v. Ensley*, 956 S.W.2d 502, 511 (Tenn. Crim. App. 1996). Under this doctrine, the exclusionary rule is inapplicable if the prosecution can establish that had certain proper and predictable investigatory procedures been used in the case at bar, those procedures would have inevitably resulted in the discovery of the evidence in question. *State v. Coury*, 657 S.W.2d 777, 780 (Tenn. Crim. App. 1983). Proof of inevitable discovery "involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment." *Nix*, 467 U.S. at 444 n.5.

Questions of credibility, the weight and value of evidence, and the resolution of conflicting evidence are matters entrusted to the trial judge, so factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). When the trial court does not set forth its findings of fact upon the record of the proceedings, this Court decides on its own where the preponderance of the evidence lies. *Fields v. State*, 40 S.W.3d 450, 457 n.5 (Tenn. 2001); *see also Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997). As in all cases on appeal, "the prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000). Appellate courts, however, conduct a de novo review of the application of the law to those facts. *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998).

Here, the defendant filed a motion to suppress the search warrants for his home and car, alleging they were constitutionally deficient because they failed to list the items to be seized. During an evidentiary hearing on August 13, 2015, Agent Nealon testified that Agent Jason Legg assisted him with the warrant process. Both officers testified as to the procedure followed when obtaining the search warrants. Both admitted the affidavits used to obtain the warrants set forth the items to be seized, but the subsequently issued warrants did not, nor did they incorporate the language of the affidavits by reference. The State agreed the warrants were defective but argued the evidence should not be suppressed because the officers acted in good faith and the evidence seized would have been inevitably discovered. Following the hearing, the trial court granted the motion to suppress, finding, "The warrants are obviously deficient. And under these circumstances, the Court does not have any recourse except to suppress the evidence as a result of the defective search warrant." The trial court reserved ruling on the State's inevitable discovery argument.

On October 6, 2015, the trial court held an evidentiary hearing to consider the applicability of the inevitable discovery doctrine. The State intended to call Mr. Meloccaro, Investigator Vittatoe, and Agent Nealon to testify. Mr. Meloccaro failed to appear, so the trial court issued a material witness warrant. Investigator Vittatoe testified regarding the search of the defendant's residence and indicated officers seized all evidence related to ammunition and the defendant's firearm ownership from common areas inside the townhouse. Agent Nealon then testified regarding the seizure of the defendant's cell phone from his bedroom, the TBI's inability to obtain evidence from the cell phone, and his subsequent attempts to obtain cell phone records from Verizon instead.

Mr. Meloccaro later appeared at an evidentiary hearing on November 20, 2015. Pursuant to the material witness bond and at the State's expense, Mr. Meloccaro had been detained in a Guam jail for approximately twenty-six days, traveled to Tennessee via plane while in handcuffs, was housed in the Loudon County Jail, and brought to the hearing. Mr. Meloccaro admittedly did not want to be present. Mr. Meloccaro hoped to be released from jail after testifying. Mr. Meloccaro stated that had the officers asked him on October 15, 2011, if they could search the residence he shared with the defendant, he would have consented. After hearing additional arguments from the parties on December 8, 2015, the trial court ruled in favor of the State and allowed the admission of the evidence seized during the search of the defendant's residence.

The search warrants in the present matter undisputedly did not include a description of the items to be seized, so they were invalid under both the United States and Tennessee constitutions. The State argues the trial court properly allowed the use of

the illegally obtained evidence at trial because Mr. Meloccaro testified at the November 20, 2015 hearing, over four years after the search, that he would have consented to a search of the common areas of the residence had the officers asked. While it is well-established that consent for a warrantless search may be given by "a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected," the inevitable discovery doctrine does not apply to the situation at hand. *United States v. Matlock*, 415 U.S. 164, 171 (1974). The timing and hostile circumstances of Mr. Meloccaro's testimony make it too speculative to meet the State's burden of proving that had proper and predictable investigatory procedures been used, officers would have inevitably discovered the evidence seized during the search on October 16, 2011.

The exclusionary rule bars the admission of evidence either directly or indirectly obtained from an unconstitutional search or seizure. *State v. Carter*, 160 S.W.3d 526, 532 (Tenn. 2005). Accordingly, the trial court erred when allowing the introduction of the following: Kel-Tec P-32 pistol case; owner's manual for a Kel-Tec P-32 pistol; box of Browning 7.65 caliber ammunition with orange tag reading, "Don's Weaponry;" the live round of ammunition found in a miscellaneous box in the bottom of the closet; and photographs of the items seized and boxes searched. The trial court further erred when admitting the indirectly obtained records from Don's Weaponry and Shooting, Inc. ("Don's Weaponry") that documented the defendant's gun and ammunition purchases and when allowing Don Hill, the owner of Don's Weaponry, to testify at trial. In addition to verifying the authenticity of records from his store documenting the defendant's purchase of a Kel-Tec P-32 handgun and box of ammunition on January 14, 2009, Mr. Hill stated Fiocchi manufactured the ammunition purchased by the defendant, and Kel-Tec P-32 pistols were commonly purchased.

Given the overwhelming proof presented at trial, the trial court's error was harmless beyond a reasonable doubt. In addition to proof relating to the defendant's relationship with the victim, their interactions the night of her death, the defendant's subsequent cell phone usage, and the manner in which the victim died, the State presented proof regarding the defendant's gun ownership and the type of ammunition used during the victim's murder. The defendant willingly advised officers prior to the search that he owned a Kel-Tec P-32 handgun, and Mr. Meloccaro testified as to the defendant's gun ownership. The State exhibited the two fired and three unfired shell casings found at the crime scene and the two bullets recovered during the victim's autopsy. Agent Scott opined all bullets were 7.65 caliber and manufactured by Fiocchi. After examining the fired bullets, Agent Scott opined they had been fired from the same firearm and that firearm was manufactured by Astra, Colt, Dickson, Kel-Tec, Liberty, Ruby, or Unique. This proof was sufficient for the jury to find the defendant guilty of

- 19 -

premeditated first degree murder in violation of Tennessee Code Annotated section 39-13-202. The defendant is not entitled to relief on this issue.

## II.         Admissibility of Ballistics Expert's Opinions

Next, the defendant challenges the admissibility of the opinions rendered by ballistics and firearms identification expert Agent Scott, arguing his testimony did not meet the requirements of *McDaniel v. CSX Transp.*, 955 S.W.2d 257, 263 (Tenn. 1997). Rules 702 and 703 of the Tennessee Rules of Evidence govern the admissibility of expert testimony. Rule 702 addresses expert witness requirements and provides, "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702. Rule 703 addresses the information on which an expert opinion may be based, stating:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

Tenn. R. Evid. 703.

Courts utilize four basic components when analyzing the reliability of an expert's opinion: (1) qualifications assessment, (2) analytical cohesion, (3) methodological reliability, and (4) foundational reliability. *State v. Scott*, 275 S.W.3d 395, 402 (Tenn. 2009). The court must first determine whether, based on knowledge, skill, experience, training, or education, the witness is qualified to render the proffered opinion. *State v. Stevens*, 78 S.W.3d 817, 834 (Tenn. 2002). After determining the witness is qualified to serve as an expert on the subject of his or her testimony, the trial court must ensure the expert's opinions are sufficiently reliable to be admitted into evidence, that is whether the "basis for the witness's opinion, *i.e.*, testing, research, studies, or experience-based observations, adequately support[] that expert's conclusions." *Id*. at 834-35. This

ensures there is not a significant analytical gap between the expert's opinion and the data on which the opinion is based. *Id*.

Courts should additionally consider the methodological and foundational reliability of the expert's testimony, and the Tennessee Supreme Court has set forth these non-exclusive factors for use when doing so:

> (1) whether scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether, as formerly required by *Frye*, the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation.

*McDaniel*, 955 S.W.2d at 263. However, when weighing the reliability of expert testimony and forensic evidence, consideration of the *McDaniel* factors is not required for admissibility nor is rigid application necessary. *State v. Davidson*, 509 S.W.3d 156, 208 (Tenn. 2016). The application of the factors instead depends on the nature of the issue, the witness's particular expertise, and the subject of the expert's testimony. *Brown v. Crown Equip. Corp.*, 181 S.W.3d 268, 277 (Tenn. 2005) (internal citations omitted).

Decisions regarding the qualifications, admissibility, relevance, and competence of expert testimony fall within the broad discretion of the trial court, and this Court will only overturn such decisions due to the arbitrary exercise or abuse of that discretion. *Davidson*, 509 S.W.3d at 208. "A trial court abuses its discretion when it applies incorrect legal standards, reaches a illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." *Scott*, 275 S.W.3d at 404-05.

Prior to trial, the defendant filed a Motion to Preclude Testimony by Steve Scott, arguing that pursuant to *McDaniel*, the trial court should prohibit Agent Scott from testifying as an expert in ballistics and firearm identification because his opinions were unreliable and not based on established scientific principles. During a subsequent hearing, Agent Scott testified as to his education, training, and experience related to the testing of ballistics evidence. Agent Scott then indicated he had previously been admitted as an expert witness in Tennessee courts over 300 times, primarily in the field of firearms analysis. Agent Scott explained his microscopic examination of the cartridges found at the scene and the bullets recovered during the autopsy. Based on similarities in the ejector marks left on the unfired bullets that had cycled through the gun's chamber and fired bullets found at the scene and during the autopsy, Agent Scott opined all had been fired from the same firearm. Agent Scott relied on his experience of looking at known

- 21 -

matches and non-matches when reaching this conclusion. Moreover, due to his familiarity with guns manufactured by Kel-Tec and a tour of the Kel-Tec factory during which he observed the manner in which Kel-Tec ejectors were made, Agent Scott opined all the bullets had been fired from a Kel-Tec P-32 pistol.

Agent Scott's findings were peer reviewed by another TBI agent. After conducting a similar examination, that agent also opined the bullets cycled through the same firearm. Agent Scott's supervisor then administratively reviewed his expert report.

Agent Scott referenced the Ruger Ten Barrel Study Test, Ruger Slides Test, a study using Glock enhanced barrels, and a study using an M-240 as scientific studies related to the reproducibility/repeatability of firearm toolmarks. One of these studies included sixty-seven test sets with zero incorrect matches, one had four hundred and thirty-six samples with five inconclusive results and zero incorrect matches, and another had 10,000 samples and only six incorrect matches. None of these studies were specific to firearms manufactured by Kel-Tec. However, the observations made by Agent Scott during his tour of the Kel-Tec factory left him with the impression all Kel-Tec ejectors leave the same mark. In a subsequent order, the trial court denied the defendant's motion and designated Agent Scott as an expert in the field of ballistics.

At trial, the defendant renewed his objections to Agent Scott's designation as an expert, and the trial court overruled them, allowing Agent Scott to testify as to his qualifications. Agent Scott had a Bachelor of Science in biology and chemistry from Austin-Peay State University and had been employed by the TBI crime lab firearm identification unit for thirty years. Agent Scott spent two years training for his TBI job, which consisted of reading multiple texts on firearm identification, writing papers on firearm identification, and performing actual examinations. While training, Agent Scott spent a lot of time using a microscope, the primary instrument used for toolmark examinations. Agent Scott's duties for the TBI included: receiving firearm and toolmark evidence, producing test bullets and cartridges, performing proximity testing, performing toolmark examinations, and using the National Integrated Ballistic Identification Network (NIBIN) to determine whether evidence sent to the lab had been used in other unsolved crimes.

Agent Scott's additional credentials included the publication of three articles in related trade journals. He was also named TBI Forensic Scientist of the Year in 2011, and admitted into the Scientific Working Group for Guns (SWGGUN) in 2012, a group formed by the Department of Justice to write forensic standards, including standards for firearm identification. Agent Scott was certified by the Association of Firearm and Toolmark Examiners (AFTE) in three fields – examination of firearms and firearm components, toolmark examination, and gun powder and primer residue testing.

Additionally, Agent Scott was certified by the American Board of Criminalists, a general certification covering basic knowledge of all work performed in crime laboratories nationwide. At the time of trial, Agent Scott had qualified and testified as a firearms and ballistics expert in Tennessee approximately 350 times. Based on his credentials, the State tendered Agent Scott as an expert in the fields of ballistics, firearms, and toolmark examinations. The trial court again accepted the designation.

When assisting with the investigation of this matter, Agent Scott examined the bullets and cartridge cases found at the scene and recovered during the autopsy and concluded, to a reasonable degree of scientific certainty, they had been fired from the same gun. Agent Scott reached this conclusion after comparing the bullets under a microscope and noting the similar characteristics. He then narrowed down the potential maker of the gun by inputting the characteristics found on examination into a database created by the FBI. In his report, Agent Scott noted he could not further reduce the list of potential firearm manufacturers. At trial, however, Agent Scott testified that based on his prior experience investigating the size and shape of extractor marks made by Kel-Tec manufactured firearms, when fired they typically create a "rectangular mark that has elements that go through the center of [the bullet] that are roughly parallel." When questioned regarding the standard for firearm identification, Agent Scott referenced the AFTE theory of identification that assumed all firearms are unique, which had never been disproven.

Relying on *Hypothesis Testing of the Critical Underlying Premise of Discernable Uniqueness in Firearms-Toolmarks Forensics Practice*, by William Tobin, an article challenging firearm and toolmark identification methods, the defendant argues Agent Scott's testimony was unreliable because it did not satisfy any of the *McDaniel* factors and should have been excluded. The *McDaniel* factors, however, are non-exhaustive and not always appropriate for application by the trial court where, as here, an expert's conclusions are based on extensive and specialized experience rather than traditional scientific evaluation. *Brown*, 181 S.W.3d at 227. Agent Scott based his conclusion that all bullets were fired by or cycled through the chamber of a Kel-Tec P-32 pistol on his extensive experience of making similar ballistics comparisons and on a recent tour of the Kel-Tec factory. Agent Scott's experience included over thirty years working in the TBI's firearms identification unit. Agent Scott spent two years training for his position with the TBI, which included proficiency in analyzing ballistics evidence under a microscope. As part of his duties with the TBI, Agent Scott performed ballistics comparisons like the comparisons made in this case and created test bullets for the purpose of making toolmark comparisons. By virtue of his knowledge, skill, experience, training, and education, Agent Scott was undoubtedly qualified under Tennessee Rule of Evidence 702 to render the opinions given in this matter. Agent Scott then based his

conclusions on experienced-based observations, making them reliable under Tennessee Rule of Evidence 703.

Moreover, applying the *McDaniel* factors, while Agent Scott was not familiar with toolmark studies specific to pistols manufactured by Kel-Tec, he was aware of studies indicating firearms manufactured by other companies leave unique marks on bullets cycled through their chambers and referenced the rate of error for each study. Agent Scott's findings in this particular case were peer reviewed by another agent. Also, while the defendant was able to reference studies challenging the reliability of the toolmark comparisons conducted by Agent Scott, he based his method of analyzing ballistics evidence on the AFTE theory that all firearms are unique, and that theory had never been disproven. Lastly, while Agent Scott's analysis was not conducted independent of litigation, as a TBI agent working in the firearms identification unit, he was tasked with analyzing forensic evidence, making consideration of whether Agent Scott conducted his research independent of litigation an unreasonable measure of the reliability of his testimony. *See David Lynn Jordan v. State*, No. W2015-00698-CCA-R3-PD, 2016 WL 6078573, at *75 (Tenn. Crim. App. Oct. 14, 2016), *no perm. app. filed* (concluding the purpose of forensic psychology is to answer questions posed by the legal system, so "the *McDaniel* factor requiring an examination of whether the research had been conducted independent of litigation is not a reasonable measure of the reliability of [an expert forensic psychologist's] testimony").

Agent Scott was qualified under Tennessee Rule of Evidence 702 to render the expert opinions offered at trial, and the opinions rendered were reliable under both Tennessee Rule of Evidence 703 and *McDaniel*. The defendant was given the opportunity to cross-examine Agent Scott regarding any weaknesses in his opinions, and the weight of Agent Scott's testimony was a matter to be determined by the jury. The trial court properly exercised its discretion when allowing Agent Scott to testify as a firearms and ballistics expert for the State. The defendant is not entitled to relief on this issue.

## III.        Admissibility of Order of Protection Documents

The defendant next argues the trial court erred when denying the defendant's motion in limine to exclude the victim's order of protection against the defendant because the statements therein were inadmissible hearsay and violated his right to confront the witnesses under Article I, Section 9 of the Tennessee Constitution and the Sixth Amendment of the United States Constitution. The State contends the statements were admissible under the state-of-mind exception to the hearsay rule and the business records exception. We conclude the redacted petition for order of protection included hearsay statements that should have been excluded by the trial court. These statements, however,

were duplicitous of other properly admitted evidence, so the trial court's error was harmless.

### A.    Hearsay

The Tennessee Rules of Evidence define hearsay as "a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Generally, hearsay is inadmissible, but there are numerous exceptions to this rule, including exceptions for statements of the declarant's then existing state of mind, sensation, or physical condition, and records of regularly conducted business. Tenn. R. Evid. 802, 803(3), and 803(6). A trial court's findings of fact and credibility determinations regarding hearsay are binding on this Court unless the evidence preponderates against them. *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015). However, determinations regarding whether a statement is hearsay and whether a hearsay exception applies are questions of law and subject to de novo review. *Id*.

Prior to trial, the defendant filed a motion in limine to exclude any mention of the order of protection. The trial court initially found "the totality of the order of protection would be admissible." Following a later hearing and a motion to reconsider filed by the defendant, the trial court, adopting a proposed order submitted by the State, ruled the order of protection documents were admissible under Rule 404(b) of the Tennessee Rules of Evidence for the purpose of proving identity, motive, intent, and/or premeditation. The trial court further found the statements contained in the documents were admissible under the hearsay exceptions for then existing state of mind, statements against interest made by unavailable witnesses, and forfeiture by wrongdoing, so the statements did not violate the defendant's right to confrontation. The trial court later entered another order finding the forfeiture by wrongdoing exception did not apply but allowed the introduction of the order of protection documents as business records and public records. The trial court further ordered all hearsay statements by the victim had to be redacted from the petition for order of protection.

In compliance with the trial court's ruling, the State introduced redacted copies of the petition for order of protection, ex parte order of protection, and agreed order of protection at trial. These documents identified the victim, identified the defendant, included a description of the defendant, stated the victim and the defendant had dated, identified the defendant's employer as Allstate, indicated the defendant kept a pistol in his truck, indicated abuse or threats of abuse had occurred in Knox County, requested a no contact order of protection, and requested the defendant to pay for the repair of the bathroom window. The victim's description of the abuse, including the date of the event, had been redacted from the documents. However, the petition showed the victim swore

to the veracity of its contents on January 18, 2011. The ex parte order of protection was entered January 20, 2011, and the agreed order of protection was dated February 10, 2011. The agreed order of protection clarified that "[t]he parties wish to have social contact" and "[the defendant] is allowed to be in the presence of the [victim]. The agreed order of protection additionally stated:

> The parties have reached a simple agreement that an order of protection should enter. Accordingly, the court makes no finding of fact; no hearing has been held; no testimony has been offered; and the respondent has made no admission with reference to this proceeding by virtue of his/her consent to the agreement, through counsel, or otherwise. **This order has no effect upon respondent's Second Amendment right to keep and bear arms. That right is <u>unimpaired</u> by this order.** (Emphasis in original.)

> Rule 404(b) of the Tennessee Rules of Evidence provides:

> **Other Crimes, Wrongs, or Acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

> (1) The court upon request must hold a hearing outside the jury's presence;
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). This Court reviews findings made by the trial court after following these procedures for an abuse of discretion. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997).

The trial court followed the procedures outlined in Rule 404(b). When reaching this conclusion, the trial court found the material issues were the identity and requisite mental state of the person who killed the victim. Referencing a long list of cases, the trial court found that "acts of violence and threats made by [the] [d]efendant against the victim [were] admissible under Tenn[essee] R[ule] of Evid[ence] 404(b) to show premeditation and intent, lack of accidental mistake, motive and a complete picture of the events

- 26 -

surrounding the killing." *See State v. Smith*, 868 S.W.2d 561, 574 (Tenn. 1993); *State v. Turnbill*, 640 S.W.2d 40, 46-47 (Tenn. Crim. App. 1982); *State v. Glebock*, 616 S.W.2d 897, 905-906 (Tenn. Crim. App. 1981); and *State v. Michael Jason Vance*, No. M2011-02469-CCA-R3-CD, 2013 WL 6001954, at \*12 (Tenn. Crim. App. Nov. 12, 2013), *perm. app. denied* (Tenn. Nov. 12, 2013).

The trial court further found the proof of the defendant's actions was clear and convincing. The victim swore under oath to the veracity of the allegations in her petition, and the petition was accompanied by a companion domestic assault filing. The State also submitted additional proof, including the letter from the defendant to Mr. and Mrs. Meredith admitting the actions and enclosing reimbursement for the damages. Moreover, when testifying at a pretrial hearing, Mr. Meloccaro corroborated the victim's statements regarding the defendant's ownership of a handgun and the location in which he kept it. Statements made by the defendant's ex-wife to authorities further corroborated the victim's claim she had a romantic relationship with the defendant. Lastly, the trial court found the probative value of the documents outweighed the danger of unfair prejudice because the documents were probative of material issues in the case, including the defendant's identity, intent, motive, and premeditation.

Our Supreme Court has concluded that "violent acts indicating the relationship between the victim of a violent crime and the defendant prior to the commission of the offense are relevant to show the defendant's hostility toward the victim, malice, intent, and a settled purpose to harm the victim." *Smith*, 868 S.W.2d at 574. For this reason, we have previously found evidence of prior domestic abuse to be admissible under Rule 404(b) where the defendant was on trial for first degree premeditated murder because such evidence "established the violent nature of their relationship and the defendant's hostility toward the victim." *State v. Gilley*, 297 S.W.3d 739, 758 (Tenn. Crim. App. 2008); *see also State v. Jeffrey Scott Long*, No. E2015-01287-CCA-R3-CD, 2017 WL 2958700, at \*13 (Tenn. Crim. App. July 11, 2017), *perm. app. denied* (Tenn. Nov. 16, 2017) (concluding allegations of threats of abuse in a petition for protective order were relevant to establish criminal intent and motive). There is no per se rule of admissibility under Rule 404(b) for prior acts of abuse. *State v. Gilley*, 173 S.W.3d 1, 7 (Tenn. 2005). Courts must instead consider the admissibility of evidence relating to prior abuse of the victim by the defendant by applying the safeguards set forth in Rule 404(b). *Id*.

The defendant was convicted of premeditated first degree murder in violation Tennessee Code Annotated section 39-13-202. First degree murder is defined as the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). Premeditation is "an act done after the exercise of reflection and judgment," meaning "that the intent to kill must have been formed prior to the act itself." Tenn. Code Ann. §

39-13-202(d). The defendant pled not guilty to first degree murder, so the State bore the burden of proving each element beyond a reasonable doubt.

The order of protection documents were properly admitted under Rule 404(b) to show the requisite motive and intent of the defendant. The redacted petition for order of protection, however, contained hearsay statements that did not fall under one of the exceptions set forth within Tennessee Rules of Evidence 803, 804, or 805, including a statement that the defendant and victim dated, reference to the defendant's ownership of a firearm that he kept inside his truck, and a statement that the victim was in "immediate and present danger of abuse" by the defendant. Accordingly, the petition for order of protection should have been excluded as hearsay, and the trial court erred when granting its admission. The ex parte order of protection and order of protection, on the other hand, were orders of the trial court, not hearsay, and again properly admitted under Rule 404(b).

## B.    Right of Confrontation

The defendant contends the erroneous admission of the hearsay contained in the petition for order of protection violated his right to confrontation. The Confrontation Clause of the Sixth Amendment to the United States Constitution provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The Tennessee Constitution similarly provides, "That in all criminal prosecutions, the accused hath the right . . . to meet the witnesses face to face." Tenn. Const. art. 1, § 9. Rights under the Confrontation Clause of the United States Constitution and the protections afforded by the Tennessee Constitution are co-extensive. *State v. Davis*, 466 S.W.3d 49, 68 (Tenn. 2015).

When determining whether an out-of-court statement violates the Confrontation Clause, the primary consideration is whether the challenged statement was testimonial. *State v. Hutchison*, 482 S.W.3d 893, 905 (Tenn. 2016). While the United States Supreme Court has not provided a comprehensive definition of "testimonial," it has rendered the following non-exhaustive list of statements that qualify as testimonial:

> [1] ex parte in-court testimony or its functional equivalent – that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably except to be used prosecutorially; [2] extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; [and 3] statements that were made under circumstances which would lead an

- 28 -

objective witness reasonably to believe that the statement would be available for use at a later trial.

*Melendez-Diaz v. Massachusetts*, 557 U.S 305, 310 (2009) (internal quotation marks and citation omitted). Testimonial hearsay is admissible only where the declarant is unavailable and there was a prior opportunity for cross-examination. *State v. Lewis*, 235 S.W.3d 136, 142 (Tenn. 2007). Nontestimonial hearsay does not fall within the ambit of federal and state confrontation clauses. *Id*. Whether the admission of hearsay statements violated the confrontation rights of a defendant is a question of law subject to de novo review. *Davis*, 466 S.W.3d at 68.

Here, the statements contained in the petition for order of protection were sworn, so like statements contained in an affidavit, they were testimonial. However, the victim was unavailable to testify at trial due to her death, and the defendant had the opportunity to cross-examine the victim regarding the information sworn to in her petition for order of protection and failed to do so. Instead, he consented to the entry of a social order of protection prior to the hearing. Accordingly, the admission of the statements in the petition for order of protection did not violate the defendant's confrontation rights.

## C. Harmless Error

Finally, we consider the impact of the error in admitting the redacted petition for order of protection. The error was non-constitutional in nature, so we review it utilizing the framework set forth within Tennessee Rule of Appellate Procedure 36(b). The defendant bore the burden of proving the error "more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b).

The petition for order of protection included statements the defendant and victim had dated, the defendant owned a firearm and kept it in his truck, and the defendant abused or threatened to abuse the victim. It further contained a request for the defendant to pay for the repair of a broken window. All this information also came into evidence through admissible sources. Investigator Vittatoe testified the defendant admitted to him that he and the victim previously dated, Ms. Okal testified the defendant referred to the victim as his girlfriend, Mr. Cordell testified the defendant had a relationship with the victim, and Dr. Hall testified the defendant admitted to having an inappropriate relationship with the victim. Mr. Meloccaro stated the defendant owned a pistol that he typically kept in his truck, and Investigator Vittatoe testified the defendant admitted to owning both a shotgun and a Kel-Tec P-32 pistol. Mrs. Meredith testified regarding the manner in which the victim claimed her bathroom window had been broken, the defendant's letter of apology following the incident, the type of damage done to the window, and the defendant's eventual payment for the cost of repairing that window.

Given the overwhelming proof presented at trial, the error in admitting the petition for order of protection was harmless. The defendant has not met his burden of proving the introduction of this evidence adversely impacted the outcome of the trial. The defendant is not entitled to relief on this matter.

## IV. Denial of Petition to Rehear Pretrial Motions

The defendant argues the trial court erred by declining to rehear all defense motions filed before January 1, 2016, which included the motions to exclude the order of protection, suppress the search of the defendant's home, and for bond. When asked to rehear the motions, the trial judge ruled, "[T]he Court previously heard these motions and the Court speaks through its orders and the Court signed the order. So I'm going to deny the petition to rehear all motions prior to January 1st of 2016." According to the defendant, when originally ruling on the motions, the trial court did not make any independent findings of fact or conclusions of law and instead adopted a proposed order submitted by the State in violation of *Smith v. USC of Lakeside, Inc.*, 439 S.W.3d 303, 312 (Tenn. 2014). The State counters that *Smith* does not apply to the Tennessee Rules of Criminal Procedure, the order complied with Rule 12(e) of the Tennessee Rules of Criminal Procedure, and, regardless, the trial court exercised independent judgment when denying the motion to exclude the order of protection. We agree with the State.

Prior to trial, a party may raise by pretrial motion "any defense, objection, or request that the court can determine without a trial of the general issue." Tenn. R. Crim. P. 12(b)(1). Tennessee Rule of Criminal Procedure 12(e) addresses the court's ruling on the motion and provides:

> The court shall decide each pretrial motion before trial unless it finds good cause to defer a ruling until trial or after a verdict. The court shall not defer ruling on a pretrial motion if the deferral will adversely affect a party's right to appeal. When factual issues are involved in deciding a motion, the court shall state its essential findings on the record.

Tenn. R. Crim. P. 12(e). "A verbatim record shall be made of all proceedings at the motion hearing, including any findings of fact and conclusions of law that are made orally." Tenn. Crim. P. 12(g). Pretrial motions addressing questions of law may be decided prior to trial, as can motions requiring factual findings not associated with the defendant's guilt or innocence. *State v. Goodman*, 90 S.W.3d 557, 561 (Tenn. 2002). "Where the factual findings necessary to resolve the motion are intertwined with the general issue, a ruling must be deferred until trial since, in criminal cases, there simply is

no pretrial procedure akin to summary judgment for adjudicating questions of fact involving the general issue of guilt or innocence." *Id*.

The defendant relies on *Smith v. USH of Lakeside, Inc.* when arguing the trial court erred by adopting the proposed findings of fact and conclusions of law submitted by the State. In that decision, our Supreme Court addressed Tennessee Rule of Civil Procedure 56.04, which requires the trial court to state the legal grounds upon which it denies or grants a motion for summary judgment and concluded that "Tenn[essee] R[ule] of Civ[il] P[rocedure] 56.04 requires the trial court, upon granting or denying a motion for summary judgment, to state the grounds for its decision before it invites or requests the prevailing party to draft a proposed order." *Smith*, 439 S.W.3d at 316-317.

The defendant's argument is misplaced. The Tennessee Rules of Civil Procedure apply only in courts exercising the civil jurisdiction of the circuit or chancery courts. Tenn. R. Civ. P. 1. Moreover, the Tennessee Rules of Criminal Procedure do not provide for summary judgment and only require the trial court to state "essential findings" on the record when ruling on pretrial matters. *See Goodman*, 90 S.W.3d at 561. Here, the trial court did so, and in light of our findings above, any error as to the specificity with which the trial court did or did not make its rulings was harmless. In the absence of the evidence obtained during the search of the defendant's residence and the order of protection documents, the State presented overwhelming proof of the defendant's guilt, and the defendant has not challenged the trial court's order setting bond on appeal. The defendant is not entitled to relief on this matter.

## V. Testimony of Carol Meredith

### A. Hearsay

The defendant next asserts the trial court erred when allowing Mrs. Meredith to testify as to hearsay statements made by the victim. The State contends these statements were properly admitted because they fell under the excited utterance exception to the hearsay rule. We agree with the State.

As addressed previously, hearsay statements are generally inadmissible, but there are several well-established exceptions to this rule. Tenn. R. Evid. 802, 803. An exited utterance is one such exception and has been defined as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Tenn. R. Evid. 803(2). A statement qualifies as an excited utterance if it satisfies all three prongs of the rule. *Kendrick*, 454 S.W.3d at 478 (internal citations omitted). First, there must be an event or condition that is "sufficiently startling to suspend the normal, reflective thought process of the declarant." *Id*. Next,

the statement must be related to the startling event or condition. *Id*. "A statement relates to the startling event when it describes all or part of the event or condition, or deals with the effect or impact of that event or condition." *Id*. Third, the declarant must have made the statement while "under the stress or excitement from the event or condition," as evidenced by a statement that suggests "spontaneity" and has a "logical relation" to the event. *Id*. Factors to consider when analyzing the applicability of the third prong include the time elapsed between the startling event and the statement; the seriousness of the startling event; the appearance, behavior, outlook, and circumstances of the declarant; and the substance of the statement. *Id*.

Consistent with Tennessee Rule of Evidence 602, the declarant must have personal knowledge of the facts contained in the statement. *Id*. at 479. This personal knowledge can be inferred from the statement itself or the surrounding facts and circumstances. *State v. Land*, 34 S.W.3d 516, 529 (Tenn. Crim. App. 2000). The declarant, however, does not have to be a participant in the startling event for the exception to apply, and answers to questions may still fall under the exception so long as the declarant remains under the stress of the event. *State v. Gordon*, 952 S.W.2d 817, 820-21 (Tenn. 1997).

Again, the trial court's findings of fact and credibility determinations regarding hearsay are binding on this Court unless the evidence preponderates against them. *Kendrick*, 454 S.W.3d at 479. Determinations regarding whether a statement is hearsay and whether a hearsay exception applies are questions of law and subject to de novo review. *Id*.

Prior to trial, the trial court ruled Mrs. Meredith could testify regarding the telephone call she received from the victim's neighbor on January 16, 2011, the victim's conversation with Mrs. Meredith regarding the defendant's attack, and Mrs. Meredith's observations of the victim and the victim's apartment that day. The trial court found the statements of the neighbor and of the victim fell under the excited utterances exception to the hearsay rule. In accordance with this ruling, Mrs. Meredith testified that the victim's neighbor called her on January 16, 2011, and said, "[Y]ou have to hurry and get here; I've heard terrible screams from downstairs." Mrs. Meredith, who was approximately half a mile from the apartment at the time, rushed to the apartment. When she arrived, the victim told Mrs. Meredith that "she came home and that [the defendant] had come out of her bathroom, out of her shower, and fought with her, and threw her down on the tile floor, and tried to hit her, beat her head against the tile floor, and tried to rape her."

Mrs. Meredith's testimony regarding the telephone call from the victim's neighbor and her subsequent interaction with the victim were offered for the truth of the matters asserted but were admissible under the excited utterance exception to the hearsay rule. Our review of the record confirmed the neighbor called Mrs. Meredith on January 16,

2011, after hearing the victim scream in a nearby apartment. This event was sufficiently startling for the neighbor to call the owner of the apartment complex to report the incident and request help. The neighbor's statement undoubtedly related to the event precipitating her call – hearing a loud scream from her neighbor's apartment. The neighbor's statement itself indicated she remained under the stress of hearing the scream at the time she called Mrs. Meredith. The substance of the statement also indicated Mrs. Meredith was familiar with the facts and circumstances of her statement. The trial court properly found the neighbor's comment to Mrs. Meredith was an excited utterance and did not err when allowing Mrs. Meredith to testify as to her communications with the neighbor. The defendant is not entitled to relief on this issue.

The defendant further argues the scream heard by the neighbor constituted hearsay within hearsay. We have already established the neighbor's conversation with Mrs. Meredith fell under the excited utterance exception to the hearsay rule. Additionally, the underlying scream was not hearsay. Nonverbal conduct can only be considered hearsay if the declarant considered the conduct to be an assertion. Tenn. R. Evid 801(a). The term "assertion" is not defined by the Tennessee Rules of Evidence, but this Court has previously stated an assertion "'has the connotation of a forceful or positive declaration.'" *State v. Thomas D. Stricklin*, No. M2005-02911-CCA-R3-CD, 2007 WL 1028535, at *19 (Tenn. Crim. App. Apr. 5, 2007), *perm. app. denied* (Tenn. Aug. 20, 2007) (quoting *State v. Burns*, 29 S.W.3d 40, 47 (Tenn. Crim. App. 1999)). For example, this Court has concluded the crying of a child was an assertion where it occurred in response to a question about inappropriate touching by a family member. *Id*.

When considered in the context of Mrs. Meredith's testimony, the victim's scream was not an assertion. Rather, the scream alerted the victim's neighbor to a potential problem, thereby prompting her to call the owner of the apartment complex. Even if the scream could be considered an assertion, the State did not introduce evidence of the scream through Mrs. Meredith's testimony to prove the truth of a matter at issue. Rather, the testimony regarding the victim's scream showed its effect on the listener. *See State v. Venable*, 606 S.W.2d 298, 301 (Tenn. Crim. App. 1980) (holding statements introduced for their effect on the listener are not hearsay). The defendant's argument is without merit.

Likewise, being attacked by the defendant was a sufficiently startling event for the victim's statements to Mrs. Meredith to qualify as excited utterances. The victim informed Mrs. Meredith that the defendant, an individual readily identifiable to her, was hiding in her bathroom when she came home that day. After she entered the apartment, the defendant attacked her, beat her head against the floor, and tried to rape her. This event was certainly startling enough to suspend the victim's normal, reflective thought process. When speaking to Mrs. Meredith, the victim described the defendant's actions

in detail, and her statements were logically related to the attack. The circumstances surrounding the victim's statements to Mrs. Meredith indicated she was still under the stress of the attack at the time of their conversation. Mrs. Meredith rushed to the victim's apartment after the neighbor reported hearing the victim scream. The victim appeared disheveled when Mrs. Meredith arrived. Mrs. Meredith indicated the victim's hair was messy, her face was wet from tears, and she was shaking. The trial court properly found the victim's statements to Mrs. Meredith fell under the excited utterance exception to the hearsay rule, so the defendant is not entitled to relief on this issue either.

### B. Violation of Court Order

The defendant next argues Mrs. Meredith's testimony regarding the neighbor's report of "terrible screams" violated an order of the trial court requiring Mrs. Meredith to testify as to "screams" only. The State counters the defendant waived this argument by failing to make a proper record reference and asserts the trial court never made such an order. Instead, the trial court decided Mrs. Meredith could not describe the screams as "blood curdling." Following our review of the record, we agree with the State.

The defendant did not provide a record citation to support his contention that Mrs. Meredith violated an order of the trial court when testifying as to "terrible screams," so he waived the argument. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived by the court."). Moreover, during our comprehensive review of the record, we did not find such a written order or oral ruling. Instead, when the defendant objected to Mrs. Meredith's testimony as violative of a prior order, the trial court overruled the objection, stating, "I did specifically say take out the blood curdling part," and "there's nothing in writing that said she had to just say screams." This ruling was consistent with the broad discretion afforded to the trial court when controlling the introduction of evidence at trial. *See State v. Hutchinson*, 898 S.W.2d 161, 172 (Tenn. 1994). The defendant's argument is without merit.

### C. Terms of Settlement

The defendant further maintains the trial court erred when allowing Mrs. Meredith to testify regarding the defendant's payment for the window repair because it was a term of the settlement of the then-pending order of protection matter. The State argues Mrs. Meredith's testimony did not address the terms of an offer to compromise this or a related matter, was not introduced to prove liability for breaking the window, helped establish the defendant's settled purpose to harm the victim, and contained important admissions of the defendant against his own interest. We agree with the State.

Tennessee Rule of Evidence 408 governs the admission of evidence of settlement and offers to settle, stating:

> Evidence of (1) furnishing or offering to furnish or (2) accepting or offering to accept a valuable consideration in compromising or attempting to compromise a claim, whether in the present litigation or related litigation, which claim was disputed or was reasonably expected to be disputed as to either validity or amount, is not admissible to prove liability for or invalidity of a civil claim or its amount or a criminal charge or its punishment. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence actually obtained during discovery merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution; however, a party may not be impeached by a prior inconsistent statement made in compromise negotiations.

Tenn. R. Evid. 408. The Advisory Commission Comment explains Rule 408 "excludes such evidence in both civil and criminal trials." This Court has further clarified that Rule 408 "addresses the admissibility of settlement negotiations regarding a *civil* claim in a civil or criminal proceeding." *State v. March*, 395 S.W.3d 738, 772 (Tenn. Crim. App. 2011) (emphasis in original).

At trial, Mrs. Meredith testified that the defendant broke the frame on the bathroom window when entering the victim's apartment. Mrs. Meredith's husband determined it would cost $275.00 to repair the window, requested the defendant pay this amount, and the defendant agreed. The defendant initially sent a money order for $250.00 to Mr. and Mrs. Meredith along with a letter of apology stating, in part, "Women tend to make us do crazy things, and unfortunately that night was one of them." The defendant sent the remaining $25.00 in a second letter.

The defendant objected at trial to Mrs. Meredith's testimony and the referenced letters on grounds they were not admissible under Tennessee Rule of Evidence 408. The trial court overruled the objection. In support of its ruling, the trial court stated, "The way the [c]ourt sees it, [the rule] says under the present litigation or related litigation. I don't believe that [the defendant] is being charged here today with breaking a window . . . so I'm going to allow the evidence to come in."

The trial court did not abuse its discretion when admitting evidence of the defendant's payment for the repair of the broken window. The trial court correctly recognized Tennessee Rule of Evidence 408 applies to offers made in "the present litigation or related litigation." The defendant attempts to argue this evidence falls under Rule 408 because the defendant's payment for the repair of the broken window was a term of the settlement of the order of protection matter. While the victim's petition for order of protection included a request that the defendant pay for repair of the window, the consent order of protection included no such term. Moreover, this matter is unrelated to the defendant's payment for the broken window. The defendant was on trial for the murder of the victim nine months after the break-in and not for a property crime arising as a result of the incident occurring on January 16, 2011. Regardless, Tennessee Rule of Evidence 408 allows the admission of settlement evidence when offered for a purpose other than establishing liability for the act. The statement was offered at trial to show the defendant participated in an incident that demonstrated his settled purpose to harm the victim, not to show he was liable for breaking a window. *See Smith*, 868 S.W.2d at 574 (concluding prior acts of violence and threats against the victim were "admissible under Rule 404(b) because the evidence [was] relevant to show the defendant's hostility toward the victim, malice, intent, and a settled purpose to harm the victim"). The defendant is not entitled to relief on this issue.

## VI.    Evidence of Prior Bad Acts

The defendant goes on to challenge the trial court's admission of testimony by Mrs. Meredith, Dr. Hall, Ms. Okal, and Mr. Cordell regarding prior unrelated actions involving the victim. Tennessee Rule of Evidence 404 governs the admission of evidence of other crimes, wrongs, or acts committed by a person whose character is at issue and states, in pertinent part:

> **Other Crimes, Wrongs, or Acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:
>
> (1) The court upon request must hold a hearing outside the jury's presence;
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). The other purposes for which bad act evidence is admissible include motive, hostility toward the victim, malice, intent, and a settled purpose to harm the victim. *State v. Hawkins*, 519 S.W.3d 1, 45 (Tenn. 2017); *Smith*, 868 S.W.2d at 574. If it substantially complies with the procedures set forth therein, this Court affords great deference to the trial court's decision to admit evidence under Rule 404(b) and will only overturn that decision if the court abused that discretion. *Hawkins*, 519 S.W.3d at 45.

Prior to trial, the trial court held evidentiary hearings to determine the admissibility of potential trial testimony relating to the defendant's prior actions of violence, harassment, and obsession towards the victim. The State called eleven witnesses, including Mrs. Meredith, Dr. Hall, Ms. Okal, and Mr. Cordell, to testify. Following the hearings, the trial court entered a written order finding, in part:

> The [d]efendant has pleaded not guilty to the first degree murder of the victim. So, identity, premeditation, intent, lack of accident or mistake, common scheme or plan, and motive are at issue in this case. Several witnesses testified about [the] [d]efendant's obsessive behaviors, acts of violence, and harassment toward the victim. The [c]ourt finds these witnesses to be credible and based on their testimony, the [c]ourt finds by clear and convincing evidence that the [d]efendant committed the acts. These crimes, wrongs, or acts that were actually witnessed by those testifying at the hearing are admissible to show identity, premeditation, intent, lack of accident or mistake, common scheme or plan, or motive. The [c]ourt further finds the probative value of the testimony is not outweighed by any danger of unfair prejudice to the [d]efendant.

Mrs. Meredith, Dr. Hall, Ms. Okal, and Mr. Cordell each rendered testimony at trial that was consistent with the testimony rendered during the pretrial evidentiary hearings. Each witness's testimony was relevant to a material issue in the case, including identity, premeditation, intent, and/or motive. The defendant's argument that the trial court did not substantially comply with the requirements of Tennessee Rule of Evidence 404(b) prior to admitting their testimony is without merit. The defendant is not entitled to relief on this issue.

## A.    Carol Meredith's Testimony

The defendant contends Mrs. Meredith's testimony was irrelevant propensity evidence offered to prove the defendant acted violently towards the victim on January 16,

2011, so must have been violent again on October 15, 2011. The State argues the proof was admissible under Tennessee Rule of Evidence 404(b) to show the defendant's settled purpose to harm the victim. We agree with the State.

Here, the trial court substantially followed the procedures outlined in Rule 404(b). First, it held a hearing outside the presence of the jury regarding the nature of Mrs. Meredith's testimony. During that hearing, Mrs. Meredith rendered testimony regarding the January 16, 2011, incident that was consistent with the testimony she rendered at trial. In a subsequent written order, the trial court found the existence of relevant issues other than the defendant's character, including identity, premeditation, intent, lack of accident or mistake, and motive. The trial court found Mrs. Meredith, and the other proffered witnesses, to be credible. For this reason, it found the proof of the defendant's actions, in Mrs. Meredith's case the defendant's forced entry into the victim's apartment and subsequent attack of her, to be clear and convincing. The trial court further found the danger of prejudice did not outweigh the probative value of the defendant's actions. Having concluded the trial court substantially complied with the procedures set forth in Tennessee Rule of Evidence 404(b), we must give great deference to the trial court's decision to allow Mrs. Meredith to testify regarding the January 16, 2011, incident.

For the same reason we found the order of protection documents admissible under Rule 404(b), Mrs. Meredith's testimony was admissible under Rule 404(b). Her testimony established that the defendant broke into the victim's apartment, damaged a window, and assaulted the victim. This proof was admissible to show the defendant's identity, lack of accident or mistake, nature of the defendant's relationship with the victim, settled purpose to harm the victim, premeditation, and intent. Moreover, Mrs. Meredith's testimony established the defendant admitted "[w]omen tend to make us do crazy things," which was relevant to the defendant's intent and motive to kill the victim. The trial court did not abuse its discretion when allowing Mrs. Meredith to testify.

### B.    Dr. Michelle Hall's Testimony

The defendant challenges the trial court's order allowing Dr. Hall, the defendant's ex-wife, to testify regarding the defendant's relationship with the victim. The defendant contends Dr. Hall's testimony violated an order of the trial court precluding Dr. Hall from testifying as to statements made by the victim and constituted evidence of prior bad acts that were improperly admitted under Tennessee Rule of Evidence 404(b). We disagree.

At trial, Dr. Hall testified regarding an incident occurring January 4, 2011, during which she learned about the defendant's relationship with the victim. While in the car together, the defendant told Dr. Hall the victim was crazy and wanted to call her and confess to having an affair with him. The defendant, however, denied the affair. During

- 38 -

their discussion, the victim called the defendant on his cell phone. Dr. Hall took the phone and had a lengthy conversation with the victim.

After her conversation with the victim ended, Dr. Hall asked the defendant how the victim knew intimate details like the color of the defendant's underwear and the presence of a scar on his penis. The defendant said he must have left the bathroom at work without fastening his pants entirely, allowing the victim to see his underwear. He also claimed the victim had knowledge of his scar because they were close friends. Dr. Hall then asked why the victim knew about past conversations the defendant and Dr. Hall had with one another. The defendant again explained he and the victim were close friends, so he told her everything. Dr. Hall asked why the victim could describe the pictures in their house. The defendant said once while Dr. Hall was out of town, the victim came inside the house before the two went out after work. After further questions from Dr. Hall, the defendant ultimately admitted only to having an improper relationship with the victim that included kissing and spending time together. The defendant and Dr. Hall ultimately divorced as a result of his affair with the victim.

The defendant objected at trial to any testimony by Dr. Hall regarding statements the victim made to her. The trial court sustained the objection. The trial court, however, allowed Dr. Hall to testify as to statements made by the defendant in response to questions posed following Dr. Hall's conversation with the victim.

Before the State called Dr. Hall as a witness at trial, the trial court substantially complied with the procedures set forth in Tennessee Rule of Evidence 404(b). Again, the trial court held an evidentiary hearing in advance of trial, during which Dr. Hall offered testimony consistent with her trial testimony. The trial court subsequently issued a written order, in which it found Dr. Hall and the other witnesses to be competent and clear and convincing proof of the defendant's actions. As related to Dr. Hall's testimony, the bad act evidence included the defendant's interactions with Dr. Hall concerning his infidelity. The trial court found material issues other than the defendant's character, including motive. The trial court further found the danger of prejudice did not outweigh the probative value of Dr. Hall's testimony.

Giving deference to the trial court's findings, we review the trial court's order allowing Dr. Hall to testify as to her interactions with the defendant on January 4, 2011, for an abuse of discretion and conclude the trial court properly admitted the testimony pursuant to Tennessee Rule of Evidence 404(b). The manner in which Dr. Hall learned of the defendant's relationship with the victim, which led to an immediate separation and ultimately divorce, was relevant to the defendant's motive to kill the victim. Intertwined with the defendant's argument that the trial court erred when admitting Dr. Hall's testimony is his contention the evidence was based on inadmissible hearsay. The trial

court, however, limited Dr. Hall's testimony to her interactions with the defendant about the victim's phone call, which included statements the defendant made in response to questions posed by Dr. Hall. These statements were admissible under Tennessee Rule of Evidence 803 as party opponent admissions. *See* Tenn. R. Evid. 803(1.2)(A) (providing that "[a] statement offered against a party that is . . . the party's own statement in either an individual or a representative capacity" is "not excluded by the hearsay rule"); *see also Lewis*, 235 S.W.3d at 145 (holding that pursuant to Rule 803(1.2), "[a]nything the opposing party said or wrote out of court is admissible in court against that party") (internal citations omitted). The trial court did not abuse its discretion when allowing Dr. Hall to testify as to the circumstances surrounding the defendant's ultimate admission to having an inappropriate relationship with the victim.

### C.      Kaitlyn Okal's Testimony

The defendant next challenges Ms. Okal's testimony. The defendant argues it constituted improper evidence of the defendant's violent character, and the trial court did not did not substantially comply with the requirements of Tennessee Rule of Evidence 404(b) when admitting it. We disagree.

At trial, Ms. Okal testified that she met the defendant on two occasions. The first meeting occurred sometime in 2010 when Ms. Okal and the victim were having dinner in a Mexican restaurant. The defendant was also present and had been drinking heavily. When Ms. Okal and the victim got up to leave, the defendant grabbed the victim's arm and followed her to the car. The victim did not feel comfortable getting into her vehicle and asked Ms. Okal to come with her. After that, the victim appeared frightened around the defendant. Ms. Okal next saw the defendant when attending a homeowner's association meeting with her husband. The defendant approached her and asked that she not say anything to his wife about the victim. At the time, the defendant referred to the victim as his girlfriend.

The trial court conducted an evidentiary hearing prior to trial. During this hearing, Ms. Okal offered testimony consistent with the testimony she rendered at trial. In its subsequent written order, the trial court found the existence of material issues other than character, including identity, premeditation, and motive. In its written order following all the Rule 404(b) hearings, the trial court found Ms. Okal to be a credible witness, and as such, found proof of the defendant's interactions with Ms. Okal to be clear and convincing. The trial court further found the probative value of Ms. Okal's testimony outweighed any prejudice.

The trial court did not abuse its discretion when admitting Ms. Okal's testimony regarding her prior encounters with the defendant. Contrary to the defendant's assertions,

these encounters were not introduced as evidence of the defendant's violent character. Rather, they were evidence the defendant and victim knew one another, had a strained relationship, and the defendant wished to keep his relationship with the victim a secret from his wife. This evidence goes to the defendant's intent and motive, both very much at issue during trial. The defendant is not entitled to relief.

### D.      James Cordell's Testimony

Finally, the defendant challenged the admission of Mr. Cordell's testimony under Tennessee Rule of Evidence 404(b), arguing it was irrelevant and only offered to prove the defendant was a violent man. Moreover, even if admissible under Rule 404(b), its probative value was vastly diminished by its prejudice to the defendant. The State asserts the trial court properly allowed Mr. Cordell to testify after finding his proffered testimony admissible to show premeditation, intent, and motive. We agree with the State.

Mr. Cordell was a friend of the victim's and testified that the defendant showed up at a birthday party for one of the victim's friends. The victim became upset, so Mr. Cordell asked the defendant to leave. The defendant refused, so Mr. Cordell asked a restaurant employee to make the defendant leave. During the dispute, the defendant told Mr. Cordell, "You don't know what she's done to me. She went to my house, told my wife." The defendant proceeded to tell Mr. Cordell how the victim had "ruined his life."

Again, prior to trial the trial court held an evidentiary hearing to determine the admissibility of Mr. Cordell's testimony. The testimony rendered by Mr. Cordell during this hearing was consistent with the testimony rendered at trial. Following the hearing, the trial court entered a written order in which it found Mr. Cordell, and the other witnesses, to be credible, and the proof of his interactions with the defendant to be clear and convincing. The trial court found material issues other than the defendant's character, including premeditation, intent, and motive. The trial court then noted the probative value of this, and all other Rule 404(b) evidence, was not outweighed by prejudice to the defendant.

Our review of the record shows the trial court substantially complied with the requirements of Tennessee Rule of Evidence 404(b), and the trial court did not abuse its discretion when allowing Mr. Cordell to testify. Mr. Cordell's testimony showed the defendant was upset about the impact of the victim's actions on his marriage and felt she had ruined his life by telling his wife about their relationship. The trial court properly found his testimony was relevant to premeditation, intent, and motive, and its probative value was not outweighed by prejudice to the defendant. The defendant is not entitled to relief on this issue.

**VII.**     **Denial of Motion for Trial Continuance**

The defendant next asserts the trial court erred when denying his motion for a trial continuance in order to obtain a mitigation expert, resulting in prejudice and the denial of a fair trial. The State contends the trial court did not abuse its discretion because the matter had been continued six times, and defense counsel had ample opportunity to obtain a mitigation expert after commencing his representation of the defendant in February 2015. We agree with the State.

The decision to grant a trial continuance lies within the sound discretion of the trial court. *State v. Russell*, 10 S.W.3d 270, 275 (Tenn. Crim. App. 1999). The trial court's denial of a motion for continuance will only be overturned where the trial court abused its discretion, and the denial resulted in prejudice to the defendant. *State v. Thomas*, 158 S.W. 3d 361, 392 (Tenn. 2005). "An abuse of discretion is demonstrated by showing that the failure to grant a continuance denied [the] defendant a fair trial or that it could be reasonably concluded that a different result would have followed had the continuance been granted." *Id*. (internal citations omitted).

On June 17, 2016, the defendant filed a motion to continue the trial set for July 25, 2016, because he needed additional time to obtain a mitigation expert and provide that expert with the information needed to prepare for trial. The trial court heard the motion on July 21, 2016, and denied it. The trial had previously been continued from December 8, 2015, to March 29, 2016, and again from March 29, 2016, to July 25, 2016. Both continuances were made at the defendant's request, and the final continuance had been granted, in part, so the defendant could obtain a mitigation expert. Finding, "[H]ere we are three months later and seem to be in the same position," the trial court denied the motion.

A Roane County grand jury indicted the defendant on June 18, 2012, and prior to the defendant's most recent request for a trial continuance, the trial court had already continued the matter at least four times. Current defense counsel took over the case around February 12, 2015. The defendant became aware of the State's intent to seek a life sentence without the possibility of parole no later than February 12, 2016, and requested a continuance on March 23, 2016, in part to obtain a mitigation expert to assist the defense during the sentencing phase of trial. At that time, the trial court continued the matter from March 29, 2016, until July 25, 2016. However, the defendant failed to offer an adequate explanation for his failure to retain a mitigation expert during the four months in which the trial court continued the matter. The trial court, therefore, did not abuse its discretion when denying the defendant's motion for a trial continuance. *See State v. Cazes*, 875 S.W.2d 253, 261 (Tenn. 1994) (holding the trial court did not abuse its discretion when denying a capital defendant a trial continuance where prior counsel

worked on the case for thirteen months before withdrawing, current counsel had been appointed to the matter two and one-half months prior to the trial setting, and many continuances had already been granted at the defendant's request). The defendant is not entitled to relief on this matter.

## VIII.  Amendment of Indictment Twelve Days Before Trial

The defendant further contends the trial court erred when allowing the State to amend its indictment to include Special Agent Michael D. Frizzell, an expert in historical cell site data analysis, twelve days before trial. The State maintains the trial court properly allowed the request, as the duty to list witnesses on the indictment is merely directory, and the defendant has not demonstrated prejudice as a result of the State's untimely disclosure of Agent Frizzell as a witness. We agree with the State.

Tennessee Code Annotated section 40-17-106 provides:

> It is the duty of the district attorney general to endorse on each indictment or presentment, at the term at which the indictment or presentment is found, the names of the witnesses as the district attorney general intends shall be summoned in the cause, and signed each indictment or presentment name thereto.

Tenn. Code Ann. § 40-17-106. The purpose of this statute is to prevent surprise and allow the defendant time to prepare a defense to the State's proof. *State v. Kendricks*, 947 S.W.2d 875, 883 (Tenn. Crim. App. 1996). This disclosure requirement, however, is directory and not mandatory. *State v. Dellinger*, 79 S.W.3d 458, 489 (Tenn. 2002). For this reason, witnesses who have not been disclosed are not automatically disqualified from testifying at trial. *Id*. Instead, the defendant must demonstrate prejudice, bad faith, or undue advantage in order to obtain relief from the State's nondisclosure or untimely disclosure of a witness. *Kendricks*, 947 S.W.2d at 883; *see also State v. Goodman*, 643 S.W.2d 375, 380 (Tenn. Crim. App. 1982). The decision to allow a witness to testify lies within the discretion of the trial court. *State v. Harris*, 839 S.W.2d 54, 69 (Tenn. 1992).

Here, the State disclosed Agent Frizzell as a potential expert witness on July 13, 2016. The motion to amend the indictment to include Agent Frizzell included the expert report prepared by Agent Frizzell regarding his cell site and sector analysis of the defendant's cell phone usage the night of October 15, 2011. The defendant objected to the late disclosure of Dr. Frizzell, arguing it greatly prejudiced his right to due process. The parties addressed this issue with the trial court via phone conference on July 22, 2016, and the trial court granted the State's request to amend the indictment to include Agent Frizzell as a potential witness.

On appeal, the defendant avers that due to the late disclosure of Agent Frizzell's expert opinions, he was unable to properly review the report and obtain the assistance of a similar expert to review and challenge Agent Frizzell's opinions. The defendant argues Agent Frizzell's testimony prejudiced him, yet he has not explained how additional time to review the report and/or contact a similar expert would have changed the defense strategy or the outcome of the trial. Moreover, aspects of Agent Frizzell's testimony potentially supported the defense theory that the State failed to present evidence placing the defendant at the crime scene the night of October 15, 2011. None of the cell phone towers Agent Frizzell opined the defendant's cell phone communicated with on October 15, 2011, were in close proximity to the crime scene. Instead, the cellular activity identified by Agent Frizzell arguably corroborated the defendant's story to Investigator Vittatoe that after being with the victim the night of October 15, 2011, he drove towards South Carolina, changed his mind, turned around, and returned to his residence.

Agent Frizzell's testimony was also consistent with Agent Nealon's analysis of the defendant's cell phone records. Both Agent Frizzell and Agent Nealon noted there were no inbound or outbound communications from the defendant's cell phone from 6:32 p.m. to 8:50 p.m. Agent Frizzell further opined that once communications resumed around 8:51 p.m., towers close to Altruda's Restaurant and the defendant's residence were pinged, again arguably corroborating the defendant's position that he dropped the victim off at her car at Altruda's Restaurant after leaving Wild Wings Café.

The defendant had access to the defendant's cell phone records prior to trial and could have retained an expert witness to conduct a similar analysis but did not. Additionally, despite the timing of the State's disclosure of Agent Frizzell's expert opinions, the defendant conducted extensive cross and re-cross examinations of Agent Frizzell that included questions regarding the placement of the cell phone towers listed in Agent Frizzell's report, an admission there were towers not included in the report, questions regarding the speculative nature of Agent Frizzell's opinions regarding the defendant's location the evening of October 15, 2011, and an admission by Agent Frizzell that his analysis revealed only the defendant's general location and not his specific location. The defendant has not met his burden of demonstrating prejudice, bad faith, or undue advantage gained by the State as a result of its late disclosure of Agent Frizzell as an expert witness. The defendant is not entitled to relief on this issue.

The defendant also avers the trial court erred when granting the State's motion to amend its indictment to include Agent Frizzell as a witness because a similar analysis could have been conducted on the victim's cell phone but those records were not preserved by the State. The defendant raises this argument for the first time on appeal, so it has been waived. *See State v. Adkisson*, 899 S.W.3d 641, 645 (Tenn. Crim. App. 1994)

(concluding "a party will not be permitted to assert an issue for the first time in the appellate court"). The defendant is not entitled to relief on this issue either.

## IX. Denial of Motions for Mistrial

The defendant further avers the trial abused its discretion when denying his motions for mistrial following improper testimony rendered by Detective Wolfe and Investigator Vittatoe. The State contends the trial court instead gave appropriate curative instructions, and there was no resulting manifest injustice. We agree with the State.

A mistrial is an appropriate remedy when the trial cannot continue or a miscarriage of justice would result if it did. *State v. McPherson*, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994). The burden is on the party seeking the mistrial to establish its necessity. *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). The decision to grant a mistrial is within the discretion of the trial court, and this Court will not overturn that decision absent an abuse of discretion. *State v. Brown*, 53 S.W.3d 264, 284 (Tenn. Crim. App. 2000).

### A. Detective Wolfe's Testimony

The defendant first argues the trial court erroneously denied his motion for a mistrial following Detective Wolfe's testimony regarding the defendant's failure to appear for his arraignment and subsequent contact with the defendant's attorney. Detective Wolfe rendered the following testimony on direct examination:

Q. Was there a court date set for the defendant after that indictment?

A. Yes, ma'am.

Q. Were you aware of that court date?

A. I was.

Q. Was the defendant in the courtroom during that date?

A. He was not.

Q. What did the Court do that day?

A. The Court issued a warrant for his arrest.

Q.	After that warrant was issued, did that get you back involved [in] the same investigation or was it a little bit of a different investigation at that point?

A.	It was a little bit different investigation at that point.

Q.	How was that different?

A.	It was different because I was directed to contact his attorney at the time and see if that attorney knew his whereabouts.

The defendant objected, and a bench conference ensued during which the defendant argued the attorney reference was inappropriate, and the record indicated the defendant was actually not represented by counsel at the time. After holding a hearing outside the presence of the jury to determine the basis for Detective Wolfe's comments and what information he would have provided had the questioning continued, the trial court denied the defendant's request for a mistrial, stating:

> Based on what the [c]ourt has heard so far, the Court finds that there is no manifest necessity [] for a mistrial based upon Detective Wolfe's testimony that after the defendant failed to appear in court on June the 25th of 2012, he was directed to contact what he believed to be [] the defendant's attorney, Paula Hamm, contacted Paula Hamm, and she advised him that she was not representing the defendant.

The parties and the trial court then discussed the best remedy. Given the trial court's ruling, the defendant asked that "[w]e just move on to a different subject and that the [c]ourt [] instruct the jury to disregard the last statement that was made by Detective Wolfe." The trial court then proceeded in the manner suggested by the defendant and this exchange ensued:

> THE COURT:	Before we broke for lunch, Detective Wolfe was on the stand testifying. And we had a bench conference that I explained that we would have from time to time. An objection was raised and we had that bench conference. And so I am going to instruct you now to disregard the last response given by Detective Wolfe prior to our lunch break. And you shall not consider it for any purpose. Is that understood?
>
> JURORS:	Yes.

The trial court did not abuse its discretion when denying the defendant's motion for a mistrial and instead offering curative instructions. Jurors are presumed to follow the instructions of the trial court, and we see no reason to deviate from that presumption. *State v. Robinson*, 146 S.W.3d 469, 494 (Tenn. 2004). The defendant has not met his burden of proving manifest injustice and is not entitled to relief on this issue.

### B. Investigator Vittatoe's Testimony

The defendant next avers the trial court abused its discretion when denying his motion for mistrial after Investigator Vittatoe referenced the defendant's refusal to answer further questions upon learning he was not under arrest, arguing the comment violated the defendant's right against self-incrimination. When questioned about the conclusion of his encounter with the defendant, Investigator Vittatoe testified:

Q. Did you have any further conversation with [the defendant]?

A. I did. I wanted to press him just a little farther. I didn't think he was being honest with me. So I told him that I – that I thought he was present when it happened, and I think that I would like to have the truth. Even told him that I thought he was responsible. That I thought that he killed [the victim], and I would like to get to the truth while we were there.

So he asked me if he was under arrest, and I told him that he was not. So he said that he would respectfully decline to answer any further questions. So at that time –

The defendant interrupted Investigator Vittatoe's testimony, requested a bench conference, and made a second motion for a mistrial. The defendant argued Investigator Vittatoe's testimony violated the defendant's constitutional rights. The State informed the trial court that Investigator Vittatoe had been instructed prior to trial not to comment on the defendant's decision to end their conversation upon learning he was not under arrest. The trial court denied the motion and stated, "Well, he didn't say he want[ed] to invoke his right to an attorney, he just said he wasn't going to answer any more questions. It's close, but I don't think it goes to [] manifest necessity for a mistrial." The trial court then admonished the State to better prepare its witnesses for trial, stating, "I'm telling you, it's getting close, and you better talk to all of your witnesses that are about to come up here that are in law enforcement. They better not make any mention at all about anybody talking to an attorney, their right to have an attorney."

The defendant asked the trial court to instruct the jury to disregard Investigator Vittatoe's statement. The trial court agreed to the request and instructed the jury to

"please disregard [Investigator] Vittatoe's last statement" and told them "not to consider his last statement for any purpose at all." The jurors acknowledged their understanding of the instruction.

Again, the jury is presumed to have followed the instructions of the trial court. *State v. Jordan*, 325 S.W.3d 1, 66 (Tenn. 2010). The jurors heard five days of testimony during the first phase of trial. Investigator Vittatoe's comment was brief and made the second morning of testimony. Even when considered in conjunction with Detective Wolfe's statement about the defendant's refusal to answer additional questions, the defendant has not established manifest injustice necessitating a mistrial. The trial court did not abuse its discretion when denying the motion, so the defendant is not entitled to relief.

## X.                  Admission of Autopsy Report as Evidence

The defendant next asserts the trial court erred when admitting the autopsy report as evidence following Dr. Cogswell's testimony because it was a prior consistent statement. The report was plainly admissible under Tennessee Code Annotated section 38-7-110(a) and fell under the hearsay exceptions for business and public records set forth in Rules 803(6) and 803(8) of the Tennessee Rules of Evidence. The defendant's argument is wholly without merit.

Tennessee Code Annotated section 38-7-110 states:

(a) The records of the division of post mortem examination, the county medical examiner, or transcripts of the records certified to by the chief medical examiner or the deputy medical examiner or the duly appointed representative of the chief medical examiner, as the reports of the toxicology laboratory examinations performed by the testing laboratory or transcripts of the reports certified to by the director of the testing laboratory or the director's duly appointed representative, shall be received as competent evidence in any court of this state of the facts and matters contained in the records or reports.

(b)      The records referred to in this section shall be limited to the records of the results of investigation, of post mortem examinations, of the findings of autopsies and toxicological laboratory examinations, including certified reports of the toxicological laboratory examinations performed by the testing laboratory, and shall not include statements made by witnesses or other persons; provided, however, that persons who prepare reports or records given in evidence pursuant to this section shall be subpoenaed as

witnesses, in either civil or criminal cases, upon demand by either party to the cause, or, when unable to appear as witnesses, shall submit a deposition upon demand by either party to the cause.

Tenn. Code Ann. § 38-7-110.

The autopsy report admitted at trial was signed by Dr. Cogswell, the deputy chief medical examiner for Knox County, and authorized by Dr. William Bennett, the chief medical examiner for Roane County. Tennessee law authorizes county medical examiners to perform or order autopsies on the bodies of "any person in a case involving a homicide; suspected homicide; a suicide; a violent, unnatural or suspicious death; an unexpected apparent natural death in an adult; sudden unexpected infant and child deaths; deaths believed to represent a threat to public health or safety; and executed prisoners." Tenn. Code Ann. § 38-7-106(a). Here, the victim's autopsy occurred after the discovery of her body in a pool of blood at the intersection of Blair Road and Old Blair Road in Roane County, Tennessee. The records were certified as authentic by a representative of the TBI director and introduced through Dr. Cogswell at trial. It is well-established that autopsy reports documenting autopsies performed following suspicious deaths are admissible at trial, and we see no reason to deviate from this precedent. *See Douglass v. State*, 378 S.W.2d 749, 751 (Tenn. 1964) (concluding autopsy reports are competent evidence and admissible at trial pursuant to Tennessee Code Annotated section 38-710, now section 38-7-110)). The defendant is not entitled to relief on this matter.

Moreover, despite the defendant's argument to the contrary, the autopsy report was not excludable as hearsay. Autopsy reports fall under the hearsay exceptions set forth in Tennessee Rules of Evidence 803(6) and 803(8) for business and public records. *State v. Davis*, 141 S.W.3d 600, 622, 630 (Tenn. 2004) (adopting the Court of Criminal Appeals' conclusion affirming the admission of autopsy reports as business records under Rule 803(6) and public records under 803(8)). Accordingly, the defendant is not entitled to the relief sought.

## XI.        Prior Statement of Brett Meloccaro

The defendant argues the trial court erred when admitting the prior consistent statement of Brett Meloccaro into evidence. The State contends the statement was admissible to rehabilitate Mr. Meloccaro, and given the overwhelming proof presented at trial, any error in admitting the document was harmless. We agree the statement should not have been admitted as substantive evidence, but any error in its admission was harmless.

Prior consistent statements are generally inadmissible as a means of bolstering a witness's testimony. *State v. Herron*, 461 S.W.3d 890, 904-05 (Tenn. 2015). This rule prevents "the jury [from] being influenced to decide the case [based] on the repetitive nature of or the contents of the out-of-court statements instead of the in-court, under-oath testimony." *State v. Tizard*, 897 S.W.2d 732, 747 (Tenn. Crim. App. 1994). There are exceptions to this rule. *Herron*, 461 S.W.3d at 905. Prior consistent statements are admissible to rehabilitate a witness following impeachment inferring the trial testimony was a "recent fabrication" or "deliberate falsehood." *State v. Benton*, 759 S.W.2d 427, 433 (Tenn. Crim. App. 1988). "This exception permits the prior consistent statement to be used as a means of rebuffing such attacks and showing that the witness's trial testimony is consistent with statements made before any improper influence or motive to lie existed." *Heron*, 461 S.W.3d at 905. Such statements, however, are to be used only as rehabilitative evidence, not as substantive evidence of the truth of the matter asserted. *Id*.

At trial, the defendant attacked Mr. Meloccaro's credibility with questions regarding his reticence to testify, his failure to attend a prior hearing, his extradition from Guam at the expense of the State, and the fact he would get released from jail following testifying for the State. In an attempt to rehabilitate Mr. Meloccaro on redirect, the State questioned Mr. Meloccaro regarding the statement he had previously given to law enforcement, and the trial court allowed its admission into evidence. In a bench conference, the defendant objected, arguing the statement was a prior consistent statement and not admissible as substantive evidence. The State averred it was using the statement to rehabilitate the witness following the defendant's cross-examination on bias. The trial court agreed with the State, overruled the objection, allowed the admission of the statement, and allowed the defendant to then re-cross examine Mr. Meloccaro on the statement. Mr. Meloccaro's statement, rendered October 24, 2011, stated:

> I met [the defendant] in May of 2011 at Wild Wing Café. I was in town looking for a house due to relocating to Knoxville, TN. We started talking and he mentioned he was also looking. We ended up getting the condo at the above address. I was out of town for work and came back the 11th of October. [The defendant] was at a golf tournament and when he came home he set a Kel-Tec P-32 or P-3AT on the kitchen table. It had an after-market pocket clip, was black, and had some wear on it. I picked it up to check it out and asked him about it. He said he carr[ies] it in his car and was getting his car detailed so he took it out. That was the first and last time I saw that gun.

This statement was consistent with Mr. Meloccaro's trial testimony. Upon request, the trial court could have instructed the jury to consider the statement only for

rehabilitative purposes, but the defendant did not make such a request, and the trial court did not render a limiting instruction. *See* Tenn. R. Evid. 105 (stating "[w]hen evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court upon request shall restrict the evidence to its proper scope and instruct the jury accordingly"). To the extent the trial court admitted the statement as substantive evidence, the trial court erred. Given the strong evidence of the defendant's guilt presented at trial, however, this error was harmless. The defendant is not entitled to relief on this issue.

## XII.        Exclusion of the Victim's Text Messages to Friends

The defendant maintains the trial court erred when precluding the defendant from introducing text messages sent by the victim to her friends as evidence she used the word "f***" as part of her regular vocabulary and would not have felt threatened by the defendant's use of the word. The State asserts the victim's use of profanity with her friends was irrelevant to the defendant's use of profanity in text messages to her. We agree with the State.

Tennessee Rule of Evidence 401 provides that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence is typically admissible, while irrelevant evidence is inadmissible. Tenn. R. Evid. 402. "Generally, the admissibility of evidence rests within the trial court's sound discretion, and the appellate court does not interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *Lewis*, 235 S.W.3d at 141). This Court finds an abuse of that discretion when the trial court applies "an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'" *Lewis*, 235 S.W.3d at 141 (quoting *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006).

Here, when cross-examining Agent Williams regarding the text messages found on the victim's cell phone, the defendant attempted to ask Agent Williams about text messages sent by the victim to a friend named "Dina." The State objected to the relevance of those messages, and the parties had the following exchange with the trial court during a bench conference:

> [DEFENSE COUNSEL]: They are making a big deal about the use of the word f***. We want to show that that is a major part of [the victim's] vocabulary in reference. And we are just going to refer to two of them to show that [] she used that word over and over again.

- 51 -

[PROSECUTOR]:  Are we trying to attack the character?

[DEFENSE COUNSEL]:  No, I'm trying to show that she knew that language and used it.

THE COURT:  How is that relevant?

[DEFENSE COUNSEL]:  If it's not relevant, then how does it have to do with the argument about that "f" meaning something that you are getting ready to make?

I'm just trying to show that, as we talked about in jury voir dire, that it's a word that she's familiar with and uses.

[PROSECUTOR]:  Why is that relevant in any way, shape, or form? How does it get to relevance?  How?

THE COURT:  I don't think its relevant.  Let's move on to something else.

The defendant was charged with the first-degree murder of the victim, which required proof of intent, premeditation, and an unlawful killing.  Tenn. Code Ann. § 39-13-202.  Nothing about the victim's text message to a friend using the word "f***" was relevant to the crime the State sought to prove or any other matter at issue in this case. The trial court did not abuse its discretion when excluding the text messages at trial.  The defendant is not entitled to relief on this issue.

## XIII.      Jury Instruction on Flight

The defendant argues the trial court erred by instructing the jury on flight because the evidence did not support the instruction.  The State counters that it presented more than sufficient circumstantial evidence to support the instruction. We agree with the State.

Every criminal defendant "has a right to a correct and complete charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions."  *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000); *see State v. Leath*, 461 S.W.3d 73, 105 (Tenn. Crim. App. 2013).  This Court must "review the charge in its entirety and read it as a whole" when determining on appeal whether a jury charge was erroneous.  *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997).  A jury instruction is

considered "prejudicially erroneous," only "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *Id*. The propriety of a jury instruction is a mixed question of law and fact, so the standard of review is de novo with no presumption of correctness. *Carpenter v. State*, 126 S.W.3d 879, 892 (Tenn. 2004).

The trial court can only charge the jury on flight if there is sufficient evidence to support the instruction. *State v. Berry*, 141 S.W.3d 549, 588 (Tenn. 2004). There is sufficient evidence to support a jury charge on flight when there is proof the defendant left the scene of the crime and of a "subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown.'" *State v. Burns*, 979 S.W.2d 279, 289-90 (Tenn. 1998) (emphasis omitted) (internal quotations omitted). The subsequent hiding out, evasion, or concealment requirement can be satisfied by evidence from which a jury may infer such action. *See State v. Joshua Hill-Williams*, No. W2015-01743-CCA-R3-CD, 2017 WL 1907735, at * 12 (Tenn. Crim. App. May 9, 2017), *perm. app. denied* (Tenn. Aug. 18, 2017). "Any contradictory evidence that serves to rebut the [S]tate's proof merely raises a question for the jury to resolve." *Id*. This Court has explained:

> The law makes no nice or refined distinction as to the manner or method of a flight; it may be open, or it may be a hurried or concealed departure, or it may be a concealment within the jurisdiction. However, it takes both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown, to constitute flight.

*State v. Dorantes*, 331 S.W. 3d 370, 388 n. 16 (Tenn. 2011) (quoting *Rogers v. State*, 455 S.W.2d 182, 187 (Tenn. Crim. App. 1970)). The defendant may rebut evidence of flight by a "credible explanation of some motive other than guilt." *Hall v. State*, 584 S.W.2d 819, 821 (Tenn. Crim. App. 1979).

Here, the trial court charged the jury with the following instruction on flight:

> The flight of a person accused of a crime is a circumstance which, when considered with all the facts of the case, may justify an inference of guilt. Flight is the voluntary withdrawal of oneself for the purpose of evading arrest or prosecution for the crime charged. Whether the evidence presented proves beyond a reasonable doubt that the defendant fled is a question for you to determine.
>
> The law makes no precise distinction as to the manner or method of flight; it may be open, or it may be a hurried or concealed departure, or it

may be a concealment within the jurisdiction. However, since it takes both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown, to constitute flight.

If flight is proved, the fact of flight alone does not allow you to find that the defendant is guilty of the crime charged. However, since flight by a defendant may be caused by a consciousness of guilt, you may consider the fact of flight, if flight is so proven, together with all of the other evidence when you decide the guilt or innocence of the defendant. On the other hand, an entirely innocent person may take flight and such flight may be explained by proof offered, or by the facts and circumstances of the case.

Whether there was flight by the defendant, the reasons for it, and the weight to be given to it, are all questions for you to determine.

The defendant contends that based on the proof presented at trial, the instruction was inappropriate. In support of his position, the defendant points out he did not leave the Knoxville area for Pearl River County, Mississippi, where he grew up, until approximately two months after the victim's death. Moreover, testimony regarding the defendant's failure to attend his arraignment, of which he did not have notice, could not be used to support a flight instruction.

In response, the State argues there was more than sufficient circumstantial evidence of flight to support the instruction. The defendant failed to show up for his arraignment and was stopped the next day with a gun, clothes, and a sleeping bag in his truck. Further, despite the trial court's flight instruction, the defendant was free to argue against a finding of flight in his closing argument, and the trial court instructed the jury that "flight alone does not allow you to find the defendant is guilty of the crime charged."

The State introduced sufficient evidence of flight to support the jury charge regarding the same. Only after the defendant did not appear for his arraignment did authorities realize the defendant could not be found in the area. When Sheriff Allison arrested the defendant in Pearl River County, Mississippi, the defendant had a shotgun, clothing, and a sleeping bag in his car. This evidence is sufficient to prove the defendant left Roane County, the location of the victim's murder, following her death and during the pendency of the criminal proceedings, for "parts unknown."

Moreover, the trial court instructed the jury that "flight alone does not allow you to find that the defendant is guilty of the crime charged" and "an entirely innocent person may take flight and such flight may be explained by proof offered, or by the facts and

circumstances of the case." The defendant was free to rebut the flight theory by offering his apparent explanation for this departure, he returned to his hometown to live following the victim's death, and failed to do so. Further, given the overwhelming, albeit circumstantial, proof of the defendant's guilt, any error in giving the flight instruction did not affect the outcome of the case and was harmless. *See, e.g., State v. Smith*, 893 S.W.2d 908-18 (Tenn. 1994) (concluding "any error as to the flight instruction" was harmless given the "overwhelming proof of [the defendant's] guilt"). The defendant's argument is not well taken, and he is not entitled to relief on this issue.

## XIV. Prosecutorial Misconduct

### A. Improper Statements

The defendant argues this Court should vacate his conviction because the State made at least four improper comments to the jury regarding evidence, thereby establishing a pervasive pattern of misconduct that affected the verdict to the defendant's detriment. In response, the State contends that on all four occasions the defendant either waived his objection or the statement did not rise to the level of prosecutorial misconduct. We agree with the State.

To prevail on a claim of prosecutorial misconduct, the defendant must establish the conduct complained of was so inflammatory or improper that it adversely affected the verdict. *Harrington v. State*, 385 S.W.2d 758, 759 (Tenn. 1965); *State v. Gray*, 960 S.W.2d 598, 609 (Tenn. Crim. App. 1997). The defendant does not allege the State's comments infringed on his constitutional rights, so this Court considers the following factors:

1. The conduct complained of viewed in context and in light of the facts and circumstances of the case.

2. The curative measures undertaken by the court and the prosecution.

3. The intent of the prosecutor in making the improper statement.

4. The cumulative effect of the improper conduct and any other errors in the record.

5. The relative strength or weakness of the case.

*Judge v. State*, 539 S.W.2d. 340, 344 (Tenn. Crim. App. 1976); *see also State v. Jackson*, 444 S.W.3d 554, 591 n. 50 (Tenn. 2014) (noting, "the *Judge* factors should only be

applied to claims of improper prosecutorial argument" and not claims of unconstitutional prosecutorial comment). The defendant bears the burden of proving prejudice due to improper prosecutorial statements. *Jackson*, 444 S.W.3d at 591 n.50. To merit a new trial, "the argument must be so inflammatory or improper as to affect the verdict." *State v. Gann*, 251 S.W.3d 446, 459 (Tenn. Crim. App. 2007) (internal citation omitted).

First, the defendant argues that during a bench conference addressing testimony rendered by Dr. Hall, the State loudly remarked, "[Defense counsel] wants to keep all of this out at all costs because it's very devastating for [the defendant]" and then admitted, "I don't whisper well." The defendant complained about the volume of the State's comments, stating, "[I]t disturbs me when we are at the bench and the State speaks loud enough for the jury to hear . . . [t]hat's improper, Your Honor." The trial court reminded the parties to keep their voices down when approaching the bench. The defendant did not request that the trial court give curative instructions to the jury, and the trial court did not render any on its own initiative. Instead, the State resumed its questioning of Dr. Hall.

After voicing concern that the jury overheard statements made during the bench conference, the defendant should have either requested curative instructions or polled the jurors to determine whether curative instructions were warranted. *See State v. Griffis*, 964 S.W.2d 577, 599 (Tenn. Crim. App. 1997) (holding "[i]f a party fails to request a curative instruction, or, if dissatisfied with the instruction given does not request a more complete instruction, the party effectively waives the issue for appellate purposes"); *see also State v. Steve A. White*, No. W2000-01148-CCA-R3-CD, 2003 WL 21338920, at *25 (Tenn. Crim. App. May 23, 2003), *perm. app. denied* (Tenn. Oct. 27, 2003) (finding the defendant waived his argument the State spoke too loudly during a bench conference because curative instructions were not requested, and the jurors were not polled to determine whether they overheard the conference). By failing to take appropriate measures to lessen any prejudicial impact of the State's actions, the defendant waived this issue on appeal and is not entitled to relief.

Second, the defendant contends the State made improper comments to the jury during the cross-examination of Ms. Dukic. During its direct examination of the witness, the State played a portion of the surveillance video from Wild Wings Café. During cross-examination, the defendant requested to play the video in its entirety. The State commented, "Your Honor, I think the defense has the right to do that; I warn the jury it's the full hour plus that they [were] there." The defendant did not object and instead, with the permission of the court, proceeded with playing the video in its entirety. The defendant now contends the prosecutor's statement improperly suggested the defendant was trying to waste the jury's time or make the jury suffer through irrelevant, boring evidence. The defendant waived this argument by failing to make a contemporaneous objection. See *Robinson*, 146 S.W.3d at 51 (concluding a defendant's failure "to proffer

contemporaneous objections to the challenged remarks" waives the issue on appeal). The defendant is not entitled to relief on this issue either.

Third, the defendant argues the trial court failed to offer a curative instruction following an improper comment made by the State in the presence of the jury during its re-direct examination of Mr. Hill. The State contends the statement was not so inflammatory as to adversely impact the verdict. Again, we agree with the State.

When the defendant cross-examined Mr. Hill, the following exchange occurred:

[DEFENSE COUNSEL]: Now, this Kel-Tec weapon, is that a common weapon?

[HILL]: Yes, sir, we sell many of them.

[DEFENSE COUNSEL]: Okay.

[HILL]: The Kel-Tec 32, and the Kel-Tec 380 are two very popular pistols.

[DEFENSE COUNSEL]: Okay, by very popular, you're talking about the number that you sell at your store, is that correct?

[HILL]: Yes, sir.

[DEFENSE COUNSEL]: Can you give us an approximate number that you would sell of this weapon in a year?

[HILL]: No, sir, I would have to go back through my records to find out.

[DEFENSE COUNSEL]: Do you keep a lot of them in stock?

[HILL]: Normally, I keep one in the counter and three in the back room.

[DEFENSE COUNSEL]: And you move through them quite quickly in selling?

[HILL]: It varies[;] sometimes you will go a week and sell one and then sell two in one day you know, you never know, it's – there's no rhyme or reason behind it.

[DEFENSE COUNSEL]: So since 2009, do you have any approximation as to how many Kel-Tec P-32s you sold in your store in North Little Rock?

[HILL]: No, sir, I don't. I don't have any idea, here again I would have to go back and research that to find out.

[DEFENSE COUNSEL]: But you would refer to that as a popular weapon?

[HILL]: Yes, sir. Uh-huh (affirmative)

[DEFENSE COUNSEL]: And it is sold, to your knowledge, all over the country?

[HILL]: Yes, sir, I don't know of any state, well the states that don't allow the sale of firearms, you know it might not be, but it is pretty much country wide.

Later, during the State's re-direct examination of Mr. Hill, this related exchange transpired:

[PROSECUTOR]: Do you know what an ejector mechanism is?

[HILL]: Yes.

[PROSECUTOR]: Okay, yesterday we had some testimony from a witness Steve Scott, he's a ballistic expert with the Tennessee Bureau of Investigation, and he was talking about ejectors, and he testified that –

[DEFENSE COUNSEL]: Your Honor, this is outside the scope.

[PROSECUTOR]: Well, Your Honor, the defense has asked Mr. Hill about how many of these Kel-Tec pistols get sold, and I'm [getting] to that and wish to rebut the implication that the defense left that there[ ][are] lots and lots of these pistols out there, suggesting to the jury that anyone else might have shot [the victim] with such a pistol. I think I can narrow that some through redirect examination; that's what I seek to do.

[DEFENSE COUNSEL]:   We object to the statements by [the prosecutor] and say they're improper and ask the Court to instruct the jury to disregard those statements.

[PROSECUTOR]:                Of course, Your Honor, if my line of questions is ligament that's not necessary.

THE COURT:        Are we going to [] different makes of firearms, or the firearm parts themselves.

[PROSECUTOR]:                The firearm parts[;] I just want to ask the witness about whether or not he ever gets request[s] to swap the ejector mechanism in pistols.

THE COURT:        I'll allow it.

[PROSECUTOR]:                Thank you, Your Honor.

[PROSEUCTOR]:                Mr. Hill, you know what the ejector mechanism is?

[HILL]:        Yes, I do.

[PROSECUTOR]:                Do you ever get request[s] to swap ejector mechanisms in pistols?

[HILL]:        Not just swap, about the only time that we ever replace one is one that is broke, or worn to the point it won't work anymore.

[PROSECUTOR]:                That's all I have, Your Honor.

RE-CROSS EXAMINATION

[DEFENSE COUNSEL]:   And you order those separate, is that correct?

[HILL]:        Yes, sir, it's according to what – we don't keep all those parts in stock, just certain ones we keep, therefore, it's according to what kind of gun it is.

[DEFENSE COUNSEL]:   And they are available, is that correct?

[HILL]:        Oh yes, sir, they are all available through the manufacturers.

The defendant argues the State improperly explained in the jury's presence that "[w]e wish to rebut the implication that the defense left that there[ ][are] lots and lots of these pistols out there, suggesting to the jury that anyone else might have shot [the victim] with such a pistol," because by doing so, the State inferred the defendant intentionally mislead the jury through its cross-examination of Mr. Hill.  When viewed in the context of the facts and circumstances of the case, we disagree.  Through its comment, the State attempted to respond to the defendant's objection by pointing the trial court to the prior questions raised by the defendant to which it was responding.  The State plainly articulated this intent on the record.  Moreover, to the extent this explanation was better suited for a bench conference, it was not so inflammatory as to adversely impact the outcome of the trial.  If anything, Mr. Hill's response to the State's question further supported the defendant's point that firearms manufactured by Kel-Tec are popular.  Additionally, this was one comment over the course of an eight day trial, the State presented strong proof of the defendant's guilt, and the trial court later instructed the jury that the comments of counsel are not evidence.  We have also already concluded that without Mr. Hill's testimony, the State presented sufficient evidence to sustain the defendant's conviction.  Again, the defendant is not entitled to relief.

Finally, the defendant argues that through the following exchange with Agent Scott, the State improperly suggested the defendant's gun had not been submitted for testing because the defendant had either hidden the gun or was unwilling to turn it over for testing:

[PROSECUTOR]:  And if we had the defendant's Kel-Tec you could examine it, couldn't you?

[SCOTT]:    Yes, I could.

[PROSECUTOR]:        But we don't have it, do we?

[SCOTT]:    It was not submitted to the laboratory.

The defendant did not object at trial, so the issue has been waived on appeal.  *See* Tenn. R. App. P. 36(a); *see also Gilley*, 297 S.W.3d at 762.  Once again, the defendant is not entitled to relief.

The defendant failed to meet his burden of proving the challenged statements were so inflammatory or improper that they adversely affected the verdict.  The defendant

either waived his objection to each challenged statement, or the comment did not constitute prosecutorial misconduct. The defendant is not entitled to relief on this matter.

### B.     Closing Arguments

The defendant further contends that during closing arguments, the State made several improper references to the defendant's decision not to testify, including a comment regarding the defendant's refusal to look at a photograph of the victim. We disagree. While the State commented on the defendant's behavior in the courtroom, the comment was not such that the jury could have construed it as a reference to the defendant's decision not to testify at trial. The defendant waived any additional constitutional challenges to the State's closing arguments.

Closing arguments are an important tool during trial, so attorneys are given a wide-range of autonomy when making them, and the trial court has a wide-range of discretion when controlling them. *See State v. Carruthers*, 35 S.W.3d 516, 577-78 (Tenn. 2000) (appendix). "Notwithstanding such, arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." *State v. Goltz*, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003). It is possible for five general areas of prosecutorial misconduct to occur during closing arguments:

> (1) intentionally misleading or misstating the evidence; (2) expressing a personal belief or opinion as to the truth or falsity of the evidence or defendant's guilt; (3) making statements calculated to inflame the passions or prejudices of the jury; (4) injecting broader issues than the guilt or innocence of the accused; and (5) intentionally referring to or arguing facts outside the record that are not matters of common public knowledge.

*Id*. "In determining whether statements made in closing argument constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether the impropriety affected the verdict." *State v. Pulliam*, 950 S.W.2d 360, 367 (Tenn. Crim. App. 1996).

The defendant alleges prosecutorial misconduct as a result of statements rendered during the State's closing arguments that improperly referenced his failure to testify at trial. The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Similarly, article I, section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. Both provisions guarantee criminal defendants the

unfettered right to remain silent and not testify at trial. *Carter v. Kentucky*, 450 U.S. 288, 305 (1981). Both provisions further prevent the State from commenting on the accused's silence. *Griffin v. California*, 380 U.S. 609, 615 (1965); *Jackson*, 444 S.W.3d at 586. It is possible, however, for the State to describe the proof as uncontradicted or make other indirect references to the defendant's silence without infringing on the defendant's Fifth Amendment rights, so long as the defendant is not the only person who could offer the contradictory proof. *Jackson*, 444 S.W.3d at 586-87 (internal citation omitted).

This Court reviews the propriety of prosecutorial comments regarding the right to remain silent under a de novo standard and applies the following two-prong test:

> (1) whether the prosecutor's manifest intent was to comment on [the] [d]efendant's right not to testify; or (2) whether the prosecutor's remark was of such a character that the jury would necessarily have taken it to be a comment on [the] [d]efendant's decision not to testify.

*Jackson*, 444 S.W.3d at 588.

The defendant contends the following statement made by the prosecutor during the State's rebuttal closing argument, coupled with the prosecutor's simultaneous actions and the overall tenor of the State's closing arguments, caused the jury to improperly infer his silence was evidence of guilt:

> You've got threatening communications from [the defendant] at 6:32 and then you've got the most damning piece of evidence that is proof that [the defendant], considering everything else was in Roane County that night, is [the victim's] body at the intersection of Blair Road and Old Blair Road. That's proof that he was there. That [the defendant] is proof. And he won't look at it.

While speaking, the prosecutor held a color photograph of the victim about two feet in front of the defendant, who was seated at the counsel table. Defense counsel objected, arguing the comment was a direct reference to the defendant's failure to testify. The trial court disagreed, stating, "I don't see that; I can't make that connection. He didn't say anything about his testifying. He didn't say anything about him testifying."

The defendant argues the prosecutor's actions were improperly designed to either elicit a response from the defendant or cause the jury to view the defendant's silence as an admission of guilt. The defendant further contends the prosecutor's actions before and after making this argument bolstered the jury's perception that the State was asking it to

view the defendant's silence as an admission of guilt. For example, during its initial closing argument, the State commented:

> The evidence is here to convict. We gave it to you, just as we said we would. The defendant has made no contradictions to this evidence.
>
> Measure the facts against your common sense. The defendant has shown us all who he is. [The defendant] is a murderer. Believe him; convict him of the first degree murder of [the victim].

As he did during the State's rebuttal closing, the defendant objected and argued the prosecutor intended this statement as a comment on the defendant's right to testify. The trial court found this statement, and others to which the defendant had objected, were proper and raised in response to issues brought up by the defendant in his opening statement and throughout trial.

Later during the State's initial closing argument, the prosecutor stated, without objection from the defendant:

> When we talk about the puzzle that might make up the picture for reasonable doubt, I want you to think about a different puzzle. I want you to think about the puzzle that is [the defendant]. He is a puzzle.
>
> There is no way I can explain to you standing here now, why [the defendant] acts like he does. I can't do it. We can't see inside his head. There's no way I can explain to you why [the victim] acted the way she did in this relationship. We can't see there.
>
> But we can look at the pieces we have of [the defendant] puzzle and we can think about what that means in terms of the decision that you've got to make. And in the end there's really not a puzzle at all. Because what we have is a year-long association between [the victim] and [the defendant]. And over the course of that time a number of things happen that you can look at and think about that bears upon [the defendant's] intent, and his motive, for reasons he might have executed [the victim].

The defendant argues this soliloquy was an invitation for the jury to use the defendant's silence as an admission of guilt because he was the only one who could have offered contradictory proof.

During the State's rebuttal closing, the prosecutor then commented:

Now, what happens between January the 20th, when that order of protection is put down, and the time that the order is modified to allow social contact, we can only imagine. What happens from then and on into the summer of 2011, we can only imagine. We don't have proof about it. You don't have [the victim] here to tell you about it. You don't have other witnesses to tell you about it.

The defendant did not object to this statement at trial but now contends this was another reference to the defendant's failure to testify, particularly when considered in conjunction with these later statements:

October 14, after all this other stuff [the defendant] has done and the manner and nature of [the defendant] has been revealed through his actions. October 14th, what happens? Seven o'clock in the morning, on that Friday morning, [the defendant] calls [the victim]. Odd time to call. Odder still that he star 67's that call.

It doesn't get better for [the defendant] when he does it again one minute later at 7:01. It doesn't improve when he does it again at 7:14, and again at 7:36. Four calls, star 67 calls. What is in his head? We don't know.

I'm not asking you to speculate what he was thinking that day, I can't tell you, you don't know. But I am asking to take it in the light of all his past conduct relative to [the victim], and his obsessive behavior relative to her.

And then move on into the afternoon. Friday afternoon 3:04, [the defendant] calls [the victim]. Before that minute ends, [the defendant] calls [the victim] again. Two minutes later, again. Within that same minute a fourth time. Six minutes after the other calls within that same minute. Within that same minute another call. This goes on, 3:19, 3:29, 3:30, 3:34, 3:58. One, two, three, four, five, six, seven, eight, nine, ten, eleven, twelve. Not one of those calls is long enough according to the testimony of Karen Milbrodt from Verizon to make sure they ever connected. What was he thinking? In light of all this past activity, what was he thinking?

Does he want to pretend today that he wasn't focused on [the victim] in a way that was not good? Does he want to pretend today that he wasn't thinking bad thoughts about [the victim] that day when he's doing that?

This is the same day that Brett Meloccaro tells you I walked in, been out of town; he's sitting at his kitchen table.  He's got his P-32 Kel-Tec pistol out and he shows it to him; that day.

Why has he got this phone record and that pistol out that day?  Why?

. . .

I'm not embarrassed to say the word [the defendant] used to threaten [the victim] that day in whatever his subtle, distorted view of the world was that day.  But I'm not going to say it because you don't want to have to hear it, you've heard it enough, it's the 'F-word.'

We are 5:45:44 in the evening.  He's been with [the victim] all day.  They're not talking, they're texting.  Would it be any better if the 'don't F this up' text at forty-five minutes after five was made while she was in the bathroom any less disturbing given the backdrop of that message?

At 6:31:45, 'please don't F this up.'  You know from that video [the victim] wasn't in the bathroom on that one.  They were walking out the door.  That is the atmosphere that existed between [the defendant] and [the victim] at 6:32 p.m., when that text message was sent.  They walked out of that restaurant at 6:34, as Ms. Smith pointed out, she's several steps ahead of him.  Is that a happy couple?  Is that an irrational thing for the State to argue to you that spoke of danger to [the victim]?  Is it irrational for the State to argue that we should think that [the defendant] might have evil intentions at that point?  He spent the whole day before this obsessing about her.  He obsessed about her that day.

I don't know what [the defendant] was trying to talk her into about not F-ing something up.  I don't know.  But it doesn't matter.  Doesn't matter.  Because we have this backdrop of behavior for a whole year prior.

The defendant argues that through these statements, the State questioned the lack of information provided by the defense.  Moreover, the overall spirit of the State's closing arguments was such the jury would have necessarily taken the prosecutor's use of the victim's photograph and subsequent comment regarding the defendant's demeanor as an implication of guilt due to the defendant's failure to testify.  The defendant asserts these overwhelmingly pervasive, non-structural constitutional violations were not harmless and necessitate the reversal of his conviction.  We disagree.

Here, the defendant's argument hinges on the prosecutor's comment that the defendant would not look at the victim's photograph. This comment was a reference to the defendant's actions in the courtroom during the State's closing argument, which occurred in full view of the jury, and not an indirect reference to the defendant's decision not to testify at trial. As previously held by this Court, "comments on a defendant's demeanor that do not otherwise manipulate or misstate the evidence or implicate the rights of the defendant are not improper." *See Wendell Guinn v. State*, No. W2016-02152-CCA-R3-PC, 2018 WL 1640077, at \*6 (Tenn. Crim. App. Apr. 5, 2018), *no perm. filed* (citing *Hawkins*, 519 S.W.3d at 49). The remainder of the prosecutorial comments challenged by the defendant went largely without objection at trial and none were raised in the defendant's motions for a new trial. To the extent these statements have been individually challenged on appeal, the defendant's arguments have been waived. *See Gann*, 251 S.W.3d at 458 (holding the defendant waived plenary review where a contemporaneous objection was not made during the challenged closing argument).

Based on our review of the record, the manifest intent of the prosecutor during the State's closing argument was not to comment on the defendant's right not to testify nor was the prosecutor's statement regarding the defendant's refusal to look at the photograph of the victim of such a character that the jury would have necessarily taken it to be a comment on the defendant's right not to testify. Moreover, the trial court instructed the jury that "statements, arguments, and remarks of counsel are intended to help you in understanding the evidence and applying the law, but they are not evidence." The trial court further charged:

> The defendant has not taken the stand to testify as a witness but you shall place no significance on this fact. The defendant is presumed innocent and the burden is on the State to prove his guilt beyond a reasonable doubt. He is not required to take the stand in his own behalf and his election not to do so cannot be considered for any purpose against him, nor can any inference be drawn from such fact.

It is presumed the jury followed the instructions of the trial court, so any improper comments made by the prosecutor during the State's closing arguments were harmless. *Robinson*, 146 S.W.3d at 494. The defendant is not entitled to relief.

## XV.      Sufficiency of the Evidence

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also*

Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated this rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

The jury convicted the defendant of first degree murder. First degree murder is the premeditated and intentional killing of another person. Tenn. Code Ann. § 39-13-202(a)(1). An act is premediated if "done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d). Premeditation requires the jury to find "the intent to kill [was] formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time." *Id*. The statute further requires the jury to carefully consider the mental state of the accused at the time the accused allegedly decided to kill the victim "in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation." *Id*.

Here, the State presented evidence that the defendant and victim had been in a romantic relationship for at least a year prior to her death. The defendant met the victim while she worked in his Allstate office. The defendant was married at the time he met the victim and wished to keep his relationship with her a secret from his wife, Dr. Hall. Following a phone conversation between the victim and Dr. Hall, the defendant admitted to having an inappropriate relationship with the victim. Shortly thereafter, the defendant

and Dr. Hall divorced. The defendant blamed the victim for the demise of his marriage and exhibited anger over the situation to her friends.

Twelve days after Dr. Hall learned of the defendant's relationship with the victim, Mrs. Meredith received a telephone call reporting screams coming from the victim's apartment. Mrs. Meredith rushed to the victim's apartment. The victim answered the door with messy hair, a tear-stained face, and was visibly shaking. The victim told Mrs. Meredith she came home and found the defendant hiding in her bathroom. He jumped on her, hit her head against the tile floor, tried to rape her, and left. Two days later, the victim filed for an order of protection. Eventually, the defendant and victim agreed on the entry of a consent order of protection that allowed for social contact between the parties.

The defendant's divorce became final in June of 2011. Around that time, the defendant attended a birthday party for one of the victim's friends and told Mr. Cordell the victim ruined his life. From August 22, 2011, through October 14, 2011, the defendant initiated a large number of phone calls to the victim at all times of day, many of which were preceded by "star 67" so the victim's phone did not show the identity of the caller.

On October 15, 2011, the victim called the defendant at 9:17 a.m. and requested a ride to her car. This sparked six phone calls and forty-three text messages throughout the day, including one text message at 5:42 p.m. stating, "Don't f*** this up," and a second at 6:31 p.m. stating, "Please don't f*** this up!" The McCabes then found the victim's body lying on a rural road around 8:00 p.m. that night. Dr. Cogswell, the medical examiner, later determined the victim died as a result of three gunshot wounds – one to the chest, one to the neck, and one to the back of her head.

An analysis of the defendant's cell phone records showed that between 4:00 p.m. and 6:31 p.m. on October 15, 2011, his cell phone communicated with towers in proximity to Buffalo Wild Wings and Wild Wings Café, where the defendant admitted to investigators he had been that evening. His cell phone was then off for approximately two hours and did not resume communications with towers until 8:51 p.m., after the discovery of the victim's body.

During the ensuing investigation, the defendant admitted he owned a Kel-Tec P-32 handgun. At trial, Mr. Meloccaro confirmed the defendant's gun ownership. There were two fired and three unfired shell casings found at the crime scene and two fired bullets recovered during the victim's autopsy. Agent Scott opined all bullets were 7.65 caliber and manufactured by Fiocchi. Agent Scott examined the fired bullets and opined they

had been fired from the same firearm and that firearm was manufactured by Astra, Colt, Dickson, Kel-Tec, Liberty, Ruby, or Unique.

Two days after the victim's death, Ms. Denlinger, one of the defendant's co-workers, ran into the defendant at work. She observed the defendant putting part of a computer into the back of his Jeep while profusely trembling and shaking. When Ms. Denlinger asked the defendant if she could help, he said, "Turn back time." When Ms. Denlinger asked the defendant whether he had any direct or indirect involvement in the victim's death, he said, "Both."

The grand jury indicted the defendant on June 18, 2012. Authorities subsequently arrested the defendant in Pearl River County, Mississippi, where he lived as a child. At the time of his arrest, the defendant had a shotgun, clothing, and a sleeping bag in his car.

While circumstantial, the State presented overwhelming evidence of the defendant's guilt. The foregoing proof was sufficient for a rational jury to find the defendant guilty of the premeditated and intentional killing of the victim. We have discerned three errors in the admission of evidence: the evidence seized during the warrantless search of the defendant's residence, the hearsay statements contained in the petition for order of protection, and the prior consistent statement of Mr. Meloccaro. This evidence, however, was cumulative of above properly introduced evidence. The defendant is not entitled to relief on this issue.

## XVI.  Sentencing

### A.  Closing Arguments

The defendant further contends the State made an improper "golden rule argument" during the sentencing phase of trial. The State asserts the defendant waived this argument by failing to make a timely objection and, regardless, the closing argument was not improper. We agree with the State.

Tennessee courts have defined "golden rule argument" as:

[A]rguments by counsel suggesting to the jurors that they place themselves in the position of a party to the cause, or posing to them the question whether they would go through life in the condition of the injured [p]laintiff, or would want members of their family to go through life [physically disabled], are usually improper, and reversibly erroneous.

- 69 -

*State v. Randy Anthony Sanders*, No. M2014-02535-CCA-R3-CD, 2015 WL 5461660, *6 (Tenn. Crim. App. Sept. 18, 2015), *perm. app. denied* (Tenn. Jan. 19, 2016) (internal citation omitted).

Appellate courts afford trial courts wide discretion in their control of closing arguments, so rulings addressing statements made during closing arguments are only overturned when there has been an abuse of discretion. *Terry v. State*, 46 S.W.3d 147, 156 (Tenn. 2001). The prosecutor's closing argument "is a valuable privilege that should not be unduly restricted." *State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001). Tennessee courts have found it improper for a prosecutor to make derogatory remarks, appeal to the prejudice of the jury, misstate the evidence, or make arguments not reasonably based on the evidence. *State v. Banks*, 271 S.W.3d 90, 131 (Tenn. 2008).

"In determining whether statements made in closing argument constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether the impropriety affected the verdict." *Pulliam*, 950 S.W.2d at 367. Courts should consider the following factors when determining whether the improper conduct of a prosecutor affected the verdict to the prejudice of the defendant: (1) the conduct complained of viewed in context and in light of the facts and circumstances of the case; (2) the curative measures undertaken by the court and the prosecution; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case. *Judge*, 539 S.W.2d at 344.

The State began its closing argument during the sentencing phase of trial by stating:

I'd ask that you all close your eyes for a few minutes this morning while I talk.

I'd like for you to envision Roane County, in the middle of October. The leaves are changing; the days are getting shorter. There's a little bit of a nip in the air as the temperatures fall.

Now, if you can envision where Blair Road and Old Blair Road meet. There is no house, no business in sight, there's no street lights. What you hear around you is some water running in the distance and lots of crickets. Above you, through the clouds, you are starting to see some of the stars sparkling. It's really just before 8:00.

Now envision [the victim] standing there on the pavement. She's wearing a long sleeve orange shirt in honor of the Vols. She's got a pair of dark jeans and cowboy boots. Her hair is pulled back into a ponytail, and she's wearing her sunglasses.

The defendant is there too. He's standing a little higher up than she is towards the railroad tracks. At some point [the victim] turns away from the defendant. She turns to her right and (clap). [The victim] feels like she's been punched in the throat. Her endorphins release. There's a feeling of warmth running down her neck. She opens her mouth to talk and the only thing that comes out is blood.

She's scared, she's confused, yet she's still on her feet. She reaches her hands up to her neck, one on each side, and she realizes she's been shot.

The bullet entered her neck on the left side just under her ear. It exited on the right, slightly downward. It lacerated her jugular vein, and it severed her larynx.

Pain paralyzes [the victim's] mind. Blood is freely running down her throat, into her stomach, and into her lungs.

(Clap) [The victim] feels like a bomb goes off in her body. This is the second shot and it tears through her chest. It strikes both of her lungs, and it nicks her pulmonary artery.

[The victim's] chest is filling with blood. It's making it harder and harder for her to breathe. Her endorphins are running wild. Her heart is racing. Her neurons are firing rapidly. And that makes everything that [the victim] is experiencing turn into slow motion in her mind.

Her blood pressure drops rapidly. She's starting to go into shock. Her legs are getting weak. And her vision begins to fade.

Still [the victim] is conscious. She is aware. She's terrified. And she's in extreme pain.

She knows she is going to die, and yet she has to anticipate more from the defendant.

(Clap), the defendant raises the gun and fires an execution shot. All goes silent, and at 23 years old, [the victim] is dead.

Thank you, you can open your eyes.

The State proceeded to explain the torture it relied on as an aggravating circumstance. The defendant likely fired the gun five times. The victim received three gunshot wounds, all of which were fatal. Only the final shot, however, was immediately fatal, so the victim likely struggled to survive throughout the course of the shooting, knowing she would eventually die. The State asked the jury to weigh the victim's torment against the mitigating circumstances relied on by the defendant – no significant history of criminal activity, gainful employment for the duration of his adult life, maintenance of innocence, extensive military service, and the fact a life sentence alone would mean the defendant would not be eligible for parole for fifty-one years. Because the murder was especially heinous, atrocious, or cruel and involved torture or serious physical abuse beyond that necessary to cause death, the State asked the jury to sentence the defendant to life in prison without the possibility of parole.

After the jury began deliberations, the defendant objected to the State's entire closing argument on grounds of speculation, stating there was no proof the victim was conscious during the shooting nor was there proof as to why officials found unfired cartridge cases at the crime scene. The State countered that all statements made during closing were consistent with Dr. Cogswell's testimony. The trial court overruled the objection, stating, "The court did not find those remarks to be improper and the objection is overruled."

The defendant contends for the first time on appeal that by asking the jurors to close their eyes and envision how the victim looked and felt, the State essentially asked them to step into the shoes of the victim, thereby making an improper golden rule argument. Because the defendant failed to make a contemporaneous objection, he waived this issue. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.") Despite waiver, "when necessary to do substantial justice," this Court may "consider an error that has affected the substantial rights of a party" under plain error analysis. Tenn. R. App. P. 36(b); see also *State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010). Plain error relief is "limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994).

The following five factors must be met for plain error relief to be granted: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is "necessary to do substantial justice." *Id*. at 640-41; *see also State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (Tennessee Supreme Court formally adopted the *Adkisson* standard for plain error relief). When it is clear from the record that at least one of the factors cannot be established, this Court need not consider the remaining factors. *Smith*, 24 S.W.3d at 283. The defendant bears the burden of persuasion to show that he is entitled to plain error relief. *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007).

Here, the State did not make a golden rule argument in violation of a clear and unequivocal rule of law. The State never asked the jurors to put themselves in the victim's position. Rather, the State asked the jurors to envision the murder scene, the events surrounding the victim's death, and the related suffering of the victim, all of which were described by witnesses during the guilt phase of trial. When asking the jurors to consider the circumstances of the victim's death, the State specified: "I'd like for you to envision Roane County, in the middle of October;" "Now, if you can envision where Blair Road and Old Blair Road meet;" and "Now envision [the victim] standing there on the pavement." The State went on to graphically describe the mental and physical impact the gunshots had on the victim. Detective Wolfe described the crime scene's rural setting. Dr. Cogswell described the likely position of the victim at the time of the shooting, the likely order in which the gunshots were fired, and the injury to the victim. To the extent imagining Roane County in the middle of October required the jurors to draw on their common experiences as residents of Roane County, this was permissible. *See State v. Treva Dianne Green*, No. E1999-02204-CCA-R3-CD, 2000 WL 1839130, at *12 (Tenn. Crim. App. Dec. 14, 2000), *perm app. denied* (Tenn. May 21, 2001) (concluding statements made during closing arguments requiring the jury to consider evidence in light of "human experience and common sense" are not improper). The State's closing argument simply did not require the jurors to step into the shoes of the victim when determining whether her murder was "especially heinous, atrocious, or cruel, in that it involved torture or serious physical abuse beyond that necessary to produce death," so the defendant is not entitled to relief.

Moreover, consideration of the alleged error is unnecessary to do substantial justice. The jury did not rely on the statements of the prosecutor when finding the presence of torture and that the murder was heinous and cruel. Not only was the jury told following the first phase of trial that the statements of counsel are not evidence, but on the verdict form, the jury listed the statutory aggravated circumstances on which it relied when imposing a life sentence without the possibility of parole. When finding the

murder to be heinous and cruel, the jury relied on the findings in the final autopsy report that "[g]unshot[s] B [and] C caused aspiration and swallowing of blood, laceration at [the] base of [the] tongue not resulting in immediate death causing pain and suffering." When finding the presence of torture, the jury relied on the live rounds found at the crime scene as proof "[the victim] was aware of what was happening while hearing multiple shots and clicks." Again, the defendant is not entitled to relief.

## B. Sufficiency

The defendant next challenges the sufficiency of the evidence to support the imposition of a life sentence without the possibility of parole. Our Supreme Court has stated the crux of this argument is that the mitigating factors relied on by the defendant outweighed the aggravating circumstances presented by the State. *State v. Pruitt*, 510 S.W.3d 393, 420 (Tenn. 2016). For the reasons stated herein, we conclude the imposition of a life sentence without the possibility of parole was a proper use of the jury's discretion, so the defendant is not entitled to relief.

The jury convicted the defendant of first degree murder. The State did not seek the death penalty. Tennessee law required the jury to next determine whether to impose a sentence of life in prison or life in prison without the possibility of parole. Tenn. Code Ann. § 39-13-202(c), -207. In order for the jury to consider imposing a life sentence without the possibility of parole, the State had the burden of proving at least one aggravating circumstance by a preponderance of the evidence. Tenn. Code Ann. § 39-13-204(f). If the jury found the State did not meet its burden, it had to impose a life sentence. *Id*. If the jury found the State did meet its burden, then the decision as to whether to impose a life sentence versus life without the possibility of parole was within the jury's "considered discretion." *Id*.

The State relied on the following aggravating circumstance: "The murder was especially heinous, atrocious, or cruel, in that it involved torture or serious physical abuse beyond that necessary to produce death." Tenn. Code Ann. § 39-13-204(i)(5). Our Supreme Court has defined "torture" as "the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious." *State v. Willis*, 496 S.W.3d 653, 730-31 (Tenn. 2016) (internal citations omitted). "With respect to 'serious physical abuse beyond that necessary to produce death,'" our Supreme Court has explained, "'serious' alludes to a matter of degree, and that the physical abuse must be 'beyond that' or more than what is 'necessary to produce death.'" *Id*. at 731 (internal citations omitted). Actions by the defendant causing the victim to anticipate harm or death are sufficient to prove torture. *Id*.

The defendant relied on these mitigating circumstances: "[t]he defendant ha[d] no significant history of prior criminal activity;" and "[a]ny other mitigating factor that [wa]s raised by the evidence produced by either the prosecution or defense, at either the guilt or sentencing hearing." Tenn. Code Ann. § 39-13-204(j)(1), (9). Under subpart nine, the defendant asserted he had been gainfully employed for the duration of his adult life, maintained his innocence throughout the proceeding, had extensive military experience, and was exposed to live combat in Iraq. The defendant additionally asserted that if sentenced to life in prison alone, he would not be eligible for parole until serving a minimum of fifty-one years.

The jury found, beyond a reasonable doubt, that the murder was heinous and cruel because "gunshot[s] B [and] C cause[d] aspirations and swallowing of blood, lacerations at [the] base of [the] tongue not resulting in immediate death, causing pain and suffering." The jury also found the presence of torture. It based this finding on the two live rounds collected at the scene, finding these evidenced the victim "was aware of what was happening while hearing multiple shots and clicks."

When viewed in the light most favorable to the State, a rational juror could have found, beyond a reasonable doubt, that "[t]he murder was especially heinous, atrocious, or cruel, in that it involved torture or serious physical abuse beyond that necessary to produce death." *See Pruitt*, 510 S.W.3d at 421 (internal citations omitted) (concluding "[t]he relevant question for an appellate court is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the existence of the aggravating circumstances beyond a reasonable doubt"). Dr. Cogswell's testimony established the victim sustained three gunshot wounds. One bullet entered the left side of her neck, just below her jaw, lacerated the left jugular vein, and then exited through the right side of her neck. One bullet entered her chest through her left shoulder and hit her left lung and pulmonary artery. One bullet entered the back of her head and hit her brain stem, which would have caused very rapid or instant death. During the victim's autopsy, Dr. Cogswell found she was alive during the shooting, as the large volume of blood in her chest cavity would have been the result of inhaling and swallowing blood. He also agreed at trial the blood markings on the victim's shoes indicated she appeared to be on her feet at some point after being shot. The autopsy report noted a laceration at the base of the defendant's tongue, an injury she would have sustained before the injury that caused her death. Additionally, the police found unfired cartridges at the scene. This evidence was more than sufficient for a rational jury to find the victim experienced severe physical and mental pain while alive and conscious and that the abuse she suffered was beyond that necessary to kill her.

The defendant has not shown "the sentence was . . . imposed arbitrarily, so as to constitute a gross abuse of the jury's discretion." Tenn. Code Ann. § 39-13-207(g).

Accordingly, the defendant's sentence is supported by the evidence.  His argument to the contrary is without merit.

## XVII.        Cumulative Error

The cumulative error doctrine applies when multiple errors were committed during trial, each of which alone would have constituted harmless error, but in the aggregate have a cumulative effect on the proceedings so great the defendant's right to a fair trial can only be preserved through reversal.  *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010).  Circumstances warranting reversal of a conviction under the cumulative error doctrine "remain rare."  *Id*.  The defendant raised over twenty issues on appeal.  Of those issues, we have discerned three harmless errors:  the admission of evidence seized during the warrantless search of the defendant's residence, the admission of the order of protection documents containing inadmissible hearsay, and the prior consistent statement of Mr. Meloccaro.  In the absence of this evidence, the State presented more than ample evidence of the defendant's guilt, so the cumulative effect of the errors found on appeal was not such that it changed the outcome of the defendant's trial.  The cumulative error doctrine does not entitle the defendant to relief.

### *Conclusion*

Based on the foregoing, we affirm the judgment of the trial court.

_____
J. ROSS DYER, JUDGE